803 A.2d 482

Edward L. WHOLEY

v.

SEARS ROEBUCK, et al.

No. 105, Sept. Term, 2001.

Court of Appeals of Maryland.

June 19, 2002.

James Brewster Hopewell, Riverdale, for petitioner.

Michael Nicholas Petkovich (Jackson, Lewis, Schnitzler & Krupman, on brief) Washington, DC, for respondents.

BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BATTAGLIA, Judge.

The decisional issue before this Court is whether Maryland recognizes a common law public policy exception to the at-will employee doctrine whereby discharging an employee for investigating and reporting the suspected criminal activity of a co-worker would constitute a wrongful discharge. We conclude that a clear public policy mandate exists in the State of Maryland which protects employees from a termination based upon the reporting of suspected criminal activities to the appropriate law enforcement authorities. While we recognize such an exception, the petitioner's actions in this case, i.e. the investigation of suspected criminal activity of a store manager and reporting of that suspicion to his supervisors, do not qualify for this exception.

I. Background

The petitioner, Edward L. Wholey, was employed by the respondent, Sears, Roebuck and Co. ("Sears"), at its Glen Burnie, Maryland store as a security officer for twenty-four years, from February, 1972 until February, 1996. The petitioner had law enforcement experience prior to joining Sears, and he maintained his status and employment as a law enforcement officer during much of his tenure with Sears, with the full knowledge and approval of the company.[1] Within six

---

1. The petitioner was a Baltimore City police officer from 1968–69 and was a security officer at Montgomery Ward for some time after that.

months of commencing his employment at Sears, the petitioner was promoted to Assistant Security Manager, and in 1980, he was promoted to Security Manager. The petitioner's assigned duties included investigating suspicious behavior and reporting thefts of the store's merchandise by both customers and employees.

In March of 1995, the petitioner observed the manager of the Glen Burnie store take merchandise from the store floor into his personal office, itself a violation of company policy. The merchandise would then disappear from the manager's office. Several similar observations occurred throughout 1995, and the petitioner reported this suspicious behavior to his superior, the District Manager for Security, John Eiseman ("Eiseman"), who told the petitioner to maintain his scrutiny.

The suspicious activity continued; various Sears items were observed in the manager's office, with price tags still attached and no evidence of receipts for payment. When the petitioner informed Eiseman that the manager continued to take store merchandise into his office, and that the merchandise would subsequently disappear from his office, Eiseman offered the petitioner the use of a surveillance van so that the petitioner could, on occasion, observe the manager from outside the store. The manager's suspicious conduct continued, however, and the petitioner suggested to Eiseman that they install a camera to monitor his activities with respect to the disappearing merchandise. According to the petitioner, Eiseman approved the request and in the early morning of December 16, 1995, the petitioner and Darlene Hill, the Loss Control Manager at Sears and one who had also observed similar suspicious activity by the manager, installed a camera. Later that day, the petitioner informed Eiseman that the camera was installed and suggested that Eiseman inform his superior, the District Store Manager, about the camera installation. Some-

During his tenure at Sears, the petitioner was employed as a Constable of the District Court of Maryland from 1973–1980. In 1980, with Sears's approval, the petitioner became a deputy with the Anne Arundel County Sheriff's Office, and continues to be employed by the Anne Arundel County Sheriff's office as a Corporal.

time within the following two hours, Eiseman instructed the petitioner to remove the camera from the store because his superiors ordered its removal, asserting that a store manager was entitled to more respect. The camera was immediately removed and the investigation of the manager was thereafter discontinued.

Fewer than two months later, on February 6, 1996, the petitioner was fired from his position. Eiseman had met with the petitioner a few days earlier and told him that his superiors disliked the petitioner's "cop mentality," and did not approve of the petitioner's handling of the investigation of the manager, particularly with regard to the installation of the camera in the manager's office. Eiseman told the petitioner to resign, and should he refuse to resign, he advised the petitioner that he would be fired. The petitioner refused to resign and, therefore, was fired. Sears alleged that the termination was the result of a security problem that occurred at the store during a blizzard in January of 1996.[2]

_____

**2.** Sears contracted with ADT to monitor the perimeter alarms at the store. ADT was to report any alarm calls to the Anne Arundel County Police Department ("AACPD"), and then to a Sears employee from a list of authorized persons. During the petitioner's employment, however, the Sears policy for alarm response changed, largely due to the fact that the AACPD began imposing fines on Sears for having to respond to excessive false alarms. Thus, Sears required ADT to first contact a Sears employee from the authorized list; once contacted, the employee had the discretion to determine whether to contact the police. The petitioner was an authorized employee-contact. On January 7, 1996, at approximately 10:20pm, ADT contacted the petitioner at his home because the store alarm had sounded. ADT advised that the alarm had likely gone off due to a power outage from the blizzard conditions. The petitioner informed ADT that he was unable to personally respond because he was snowed in at his home; he instructed ADT to call the AACPD. The petitioner then called the AACPD himself to ensure that the alarm call would be investigated. The police arrived at the scene and because there were no signs of forced entry, the police cleared the alarm. The police also described the blizzard conditions in the report and explained that store employees could not report to the store because of the severe weather conditions. A few days later, it was discovered that the store had been robbed on the evening of January 7 between 8:00–9:00pm; an employee's authorization code was used to open twenty five cash registers. Despite the obvious disparity between the time the robbery occurred and the time the alarm was sounded,

■ The petitioner asserts that such a basis was merely pretextual and that the true reason for his termination was retaliation for the petitioner's investigation of the store manager for theft. The only issue on appeal, before both this Court and the Court of Special Appeals, is whether Maryland recognizes a public policy mandate regarding the investigation and reporting of criminal activity such that the discharge of an at-will employee for such would be unlawful. Given that instructions to the jury and the jury's verdict thereafter make plain that the jury found the motive for the petitioner's discharge to be his investigation of the store manager, given that the sufficiency of those findings is not at issue, and given that in either case, we view evidence in the light most favorable to the plaintiff (the petitioner) on a defendant's motions for summary judgment and judgment notwithstanding the verdict (J.N.O.V.), *see Caldor, Inc. v. Bowden,* 330 Md. 632, 636, 625 A.2d 959, 960 (1993) (quoting *Kentucky Fried Chicken Nat'l Management Co. v. Weathersby,* 326 Md. 663, 666, 607 A.2d 8, 9 (1992)), we proceed under the assumption that the sole reason for the petitioner's termination was for his investigation of the store manager, and subsequent reporting to his supervisor at Sears, and not for any failure to handle a security matter as Sears initially alleged.

Seven months after he was terminated, the petitioner filed a complaint in the Anne Arundel County Circuit Court against Sears and Eiseman, alleging wrongful discharge and defamation (based on a document written by Eiseman regarding the reasons for the petitioner's discharge) against each defendant. With respect to the wrongful discharge claim, Sears filed a motion to dismiss and a motion for summary judgment which similarly argued that, assuming the facts as alleged by the

---

Sears alleged that the petitioner's disregard for company property and failure to respond to the store alarm was the basis for petitioner's termination. We will assume, as did our colleagues in the Court of Special Appeals, that Sears discharged the petitioner for his investigation of the store manager, and not for any failure or fault in the petitioner's actions. *See Sears Roebuck & Co., v. Wholey,* 139 Md.App. 642, 779 A.2d 408 (2001).

petitioner, the termination from at-will employment did not violate a clear mandate of public policy and thus was not actionable. Both motions ultimately were denied. Sears again advocated that position when it moved for judgment at the close of the petitioner's case and at the close of trial. In each instance, the petitioner responded, and the trial court ultimately agreed, that Maryland public policy favors the investigation and prosecution of crimes, and thus the petitioner's termination contravened a clear mandate of public policy.

With respect to the wrongful discharge claim, the trial court instructed the jury, over Sears's objection, as follows:

In order to recover for wrongful discharge, [the petitioner] must show, one, an at-will employment relationship; two, that he was terminated by the employer and that the discharge was contrary to a clear mandate of public policy . . .

Now, there is a clear public policy in Maryland favoring the investigation and prosecution of criminal offenses.

If you find that the motivation of [Sears] in firing [the petitioner] was in retaliation to [the petitioner's] investigatory activities, then that motivation would contravene the stated public policy of Maryland. You must also find that [the petitioner's] investigatory activities were lawful and in accordance with the stated procedures set forth by [Sears].

A jury returned a verdict in favor of petitioner against the respondent, Sears, on the wrongful discharge count. The jury returned verdicts in favor of Sears on the defamation count and in favor of Eiseman on both the defamation and wrongful discharge counts. Sears appealed the judgment on the wrongful discharge count to the Court of Special Appeals.

The Court of Special Appeals reversed the judgement of the Circuit Court, holding that "no clear mandate of public policy was implicated in Sears's termination of [the petitioner's] employment, as a matter of law." *See* 139 Md.App. 642, 660, 779 A.2d 408, 419 (2001).

The petitioner sought, and we granted, a writ of certiorari to consider whether there exists a clear public policy mandate in Maryland with respect to the investigation and reporting of

criminal activity such that terminating an at-will employee for his/her involvement in investigating the possible criminal activity of another employee constitutes a wrongful discharge. *See Wholey v. Sears,* 367 Md. 88, 785 A.2d 1292 (2001)

## II. Discussion

▮ The pivotal issue in this case is whether a clear mandate of public policy favoring the investigation and reporting of suspected criminal activity exists in Maryland such that the termination of an at-will employee who acted congruent with this public policy is wrongful. Whether the petitioner may maintain a cause of action against Sears is dependent upon favorable resolution of this issue, and further, that he meets the requirements to sustain this cause of action, should one be adopted. The viability of a legal cause of action is clearly a question of law which, as with all questions of law, this Court shall review *de novo. See Register of Wills for Balt. County v. Arrowsmith,* 365 Md. 237, 249, 778 A.2d 364, 371 (2001) ("[A]s is consistent with our review for all questions of law, we review the order and judgment *de novo.*"); *Watson v. Peoples Security Life Ins. Co.,* 322 Md. 467, 478, 588 A.2d 760, 765 (1991)(stating that "it is for the court to determine, on any state of facts generated by the evidence, whether the relevant public policy considerations constitute the [requisite] 'clear mandate'" of public policy); *see also Strozinsky v. School District,* 237 Wis.2d 19, 614 N.W.2d 443, 448 (Wis.2000)(stating that "whether a plaintiff identifies a public policy is a question of law to be decided by the court").

## A. The Tort of Wrongful Discharge

▮ An at-will employee, such as the petitioner, has an employment contract of infinite duration which is terminable for any reason by either party.[3] *See Suburban Hosp., Inc. v. Dwiggins,* 324 Md. 294, 303, 596 A.2d 1069, 1073 (1991); *Adler v. American Standard Corp.,* 291 Md. 31, 35, 432 A.2d 464,

---

3. In the petitioner's application for employment, the petitioner acknowledged that his "employment and compensation can be terminat-

467(1981). The tort of wrongful discharge is one exception to the well-established principle that an at-will employee may be discharged by his employer for any reason, or no reason at all.[1] *See Adler*, 291 Md. at 35, 432 A.2d at 467. *See also Ewing v. Koppers Co. Inc.*, 312 Md. 45, 49, 537 A.2d 1173, 1174 (1988) (holding that the tort of wrongful discharge is also available to contractual employees). When this Court recognized the wrongful discharge tort in *Adler*, 291 Md. at 36–37, 432 A.2d at 467, we joined the growing number of states which have adopted a "public policy exception" to the common notion of at-will employment by holding, specifically, that an employee who has been "discharged in a manner that contravenes public policy" may "maintain a cause of action for abusive or wrongful discharge against his former employer." 291 Md. at 35–36, 432 A.2d at 467. *See, e.g., Luedtke v. Nabors Alaska Drilling, Inc.*, 768 P.2d 1123, 1130 (Alaska 1989); *Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 710 P.2d 1025, 1033 (1985); *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380, 385 (1988); *Tameny v. Atl. Richfield Co.*, 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330, 1333 (1980)(citing *Petermann v. Int'l Bhd. of Teamsters* 174 Cal.App.2d 184, 344 P.2d 25 (1959)); *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385, 387 (1980); *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 652 P.2d 625, 631 (1982); *Palmateer v. Int'l Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876, 878–79 (1981); *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425, 428 (1973); *Coleman v. Safeway*

---

ed, with or without cause and with or without notice, at any time, at the option of either [Sears] or [the petitioner]."

**4.** Other exceptions to at-will employment include those prescribed by federal and state legislation such as, among others, Title VII of the Civil Rights Act of 1964, 42 U.S.C., §§ 2000e–2000e–17 (1994)("Title VII"), the Fair Employment Practices Act ("FEPA"), Maryland Code (1957, 1993 Rep. Vol.), Art. 49B §§ 14–18, which prohibit basing employment decisions on race, gender, and other suspect classes, the National Labor Relations Act, 29 U.S.C. § 158 (1998), which prevents discharges for union activities, and Section 5–604(b) of the Labor and Employment Article which prohibit terminating an employee for reporting violations of the occupational safety and health regulations.

*Stores, Inc.*, 242 Kan. 804, 752 P.2d 645, 647 (1988); *Firestone Textile Co. v. Meadows*, 666 S.W.2d 730, 732 (Ky.1983); *Luethans v. Washington Univ.*, 894 S.W.2d 169, 171 n. 2 (Mo.1995)(discussing *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 877 (Mo.Ct.App.1985)); *Keneally v. Orgain*, 186 Mont. 1, 606 P.2d 127, 129–30 (1980); *Ambroz v. Cornhusker Square Ltd.*, 226 Neb. 899, 416 N.W.2d 510, 514–15 (1987); *Hansen v. Harrah's*, 100 Nev. 60, 675 P.2d 394, 396–97 (1984); *Howard v. Dorr Woolen Co.*, 120 N.H. 295, 414 A.2d 1273, 1274 (1980)(citing *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549, 551 (1974)); *Chavez v. Manville Products Corp.*, 108 N.M. 643, 777 P.2d 371, 375 (1989); *Coman v. Thomas Mfg. Co., Inc.*, 325 N.C. 172, 381 S.E.2d 445, 447 (1989); *Krein v. Marian Manor Nursing Home*, 415 N.W.2d 793, 794–95 (N.D.1987); *Burk v. K–Mart Corp.*, 770 P.2d 24, 28 (Okla.1989); *Delaney v. Taco Time Int'l, Inc.*, 297 Or. 10, 681 P.2d 114, 117 (1984)(citing *Nees v. Hocks*, 272 Or. 210, 536 P.2d 512 (1975) and *Brown v. Transcon Lines*, 284 Or. 597, 588 P.2d 1087 (1978)); *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174, 180 (1974); *Ludwick v. This Minute of Carolina, Inc.*, 287 S.C. 219, 337 S.E.2d 213, 216 (1985); *Johnson v. Kreiser's, Inc.*, 433 N.W.2d 225, 227 (S.D.1988); *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797, 801 (1985); *Payne v. Rozendaal*, 147 Vt. 488, 520 A.2d 586, 589–90 (1986); *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081, 1089 (1984); *Harless v. First Nat'l Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270, 275 (1978); *Brockmeyer v. Dun & Bradstreet*, 113 Wis.2d 561, 335 N.W.2d 834, 840 (1983); *Griess v. Consolidated Freightways Corp. of Delaware*, 776 P.2d 752, 754 (Wyo.1989).[5]

█ Thus, to establish wrongful discharge, the employee must be discharged, the basis for the employee's discharge

---

**5.** This list of cases is by no means exhaustive of all of the jurisdictions that have stated a public policy remedy. Some jurisdictions have recognized an implied covenant of good faith and fair dealing in a contract action or a tort action for wrongful discharge. *See Reed v. Municipality of Anchorage,* 782 P.2d 1155, 1158 (Alaska 1989)(con-

must violate some clear mandate of public policy, and there must be a nexus between the employee's conduct and the employer's decision to fire the employee. *See Wholey,* 139 Md.App. at 649, 779 A.2d at 412 (quoting *Shapiro v. Massengill,* 105 Md.App. 743, 764, 661 A.2d 202, 213 (1995)). That the petitioner was discharged and that the basis for the petitioner's discharge was his investigation of the store manager and subsequent reporting to his supervisors have been clearly established. Our task is to consider whether a clear mandate of public policy exists in Maryland which would prohibit the discharge of an at-will employee for his investigation of suspected criminal activity of a co-worker and reporting to his supervisors thereof. In so considering, we will attempt to clarify the somewhat obscure concept of "public policy" and the considerations which we believe compel or spurn the adoption of such a mandate.

B. Public Policy Exception

■ To be certain, our common law is not static; it may be modified by judicial decision when changing circumstances compel courts to "renovate" outdated law and policy. *See Felder v. Butler,* 292 Md. 174, 182–83, 438 A.2d 494, 499 (1981); *Adler,* 291 Md. at 42–43 432 A.2d at 471 (recognizing tort of abusive or wrongful discharge); *Condore v. Prince George's Co.,* 289 Md. 516, 530–31, 425 A.2d 1011, 1018 (1981)(asserting that the common law doctrine of necessaries is subject to change not only via statute, but via judicial fiat if the courts believe the "common law rule is a vestige of the past, no longer suitable for the circumstances of our people"); *Harris v. Jones,* 281 Md. 560, 566, 380 A.2d 611, 614 (1977) (recognizing tort of intentional infliction of emotional distress); *Deems v. Western Maryland Ry., Co.,* 247 Md. 95, 108–09, 231 A.2d 514, 522 (1967) (changing common law rule to make actions for loss of consortium available only jointly to hus-

tract); *Gates v. Life of Montana Ins. Co.,* 205 Mont. 304, 668 P.2d 213, 214–15 (1983)(tort); *Pierce v. Ortho Pharm. Corp.,* 84 N.J. 58, 417 A.2d 505, 512 (1980)(contract).

bands and wives as a legal entity); *see also* DEBORAH A. BALLAM, *Employment-at-will: The impending death of a doctrine,* 37 AM. BUS. L.J. 653, 656 (2000)(stating that "[t]ort law, perhaps more than any other area of modern U.S. law, is the magic mirror reflecting the ways changes in society lead to changes in the law").

Courts must, however, use care in creating new public policy; in *Adler,* we quoted approvingly, the United States Supreme Court's conclusion that "public policy embodies a doctrine of vague and variable quality, and, unless deducible in the given circumstances from constitutional or statutory provisions, should be accepted as the basis of a judicial determination, if at all, *only with the utmost circumspection.* The public policy of one generation may not, under changed conditions, be the public policy of another." *Adler,* 291 Md. at 46, 432 A.2d at 472 (quoting *Patton v. United States,* 281 U.S. 276, 306, 50 S.Ct. 253, 261, 74 L.Ed. 854, 867 (1930))(emphasis in original). In exercising our measured authority to define public policy, therefore, we must strive to confine the scope of public policy mandates to clear and articulable principles of law and to be precise about the contours of actionable public policy mandates.

The first limiting factor with respect to adopting a "new" public policy mandate for a wrongful discharge claim is derived from the generally accepted *purpose* behind recognizing the tort in the first place: to provide a remedy for an otherwise unremedied violation of public policy. *See Chappell v. Southern Maryland Hosp.,* 320 Md. 483, 493, 578 A.2d 766, 772 (1990)(finding it unnecessary to apply a tort remedy where the employee had other civil remedies available under both state and federal law); *Makovi v. Sherwin–Williams Co.,* 316 Md. 603, 626, 561 A.2d 179, 190 (1989). For example, in *Makovi, supra,* we held that the tort of wrongful discharge is inapplicable where the public policy sought to be vindicated— in that case, sex discrimination in the work place B is expressed in a statute which carries its own remedy for violation of that public policy. *See Makovi,* 316 Md. at 609, 561 A.2d at 182. We noted that Title VII of the Civil Rights Act of 1964,

42 U.S.C., §§ 2000e–2000e–17 (1982)("Title VII") and the Fair Employment Practices Act ("FEPA"), Maryland Code (1957, 1986 Rep. Vol.), Art. 49B §§ 14–18, set forth remedies for employees subject to unlawful sex discrimination. *Id.* at 623, 561 A.2d at 189. We therefore concluded that "the generally accepted reason for recognizing the tort, that of vindicating an otherwise civilly unremedied public policy violation, does not apply. Further, allowing full tort damages to be claimed in the name of vindicating the statutory public policy goals upsets the balance between right and remedy struck by the Legislature in establishing the very policy relied upon." *Id.* at 626, 561 A.2d at 190. The Legislature had already defined the precise remedy for the "policy violation" of sex discrimination. Had we deemed the tort of wrongful discharge applicable to Makovi's case, we would have expanded the available remedies for such violation beyond that which was articulated by the Legislature; namely, the remedies would include compensatory and punitive tort damages which were unavailable under the statute and would have "upset the balance between right and remedy struck by the Legislature in establishing the very policy relied upon." *Id.* Because the Legislature, upon considering the effect of violations of the policies they elected to promote, explicitly provided relief, it struck the appropriate balance "between right and remedy;" therefore, "provision by the courts of a further remedy goes beyond what the legislature itself thought was necessary to effectuate that public policy." *Id.* at 615, 561 A.2d at 185 (quoting *Lapinad v. Pacific Oldsmobile–GMC, Inc.,* 679 F.Supp. 991, 993 (D.Haw. 1988)).[6] Such expansion by the courts is inappropriate.

A second limiting factor in defining a public policy mandate as a cause of action in tort is the notion that the policies should be reasonably discernible from prescribed constitutional or statutory mandates. *See Makovi,* 316 Md. at 622, 561 A.2d at 188 ("Judicial power to create a tort 'is to be exercised

---

6. We digress to recognize that while statutory remedies limit the applicability of the tort, the availability of contract remedies does not prevent the tort of wrongful discharge from applying. *See Ewing,* 312 Md. at 49, 537 A.2d at 1175.

in the light of relevant policy determinations made by the [legislative branch].'")(quoting *Bush v. Lucas,* 462 U.S. 367, 373, 103 S.Ct. 2404, 2409, 76 L.Ed.2d 648, 654 (1983)). While this Court has not confined itself strictly to prior judicial opinions, legislative enactments, or administrative regulations in determining the public policy of Maryland, we have, nevertheless, recognized that the establishment of "an otherwise undeclared public policy as a basis for a judicial decision involves the application of a very nebulous concept to the facts of a given case, and that declaration of public policy is normally the function of the legislative branch." *Adler,* 291 Md. at 45, 432 A.2d at 472.

For example, in *Molesworth v. Brandon,* 341 Md. 621, 672 A.2d 608 (1996), a case in which we, again, reviewed the provisions of the Fair Employment Practices Act ("FEPA"), we held that Art. 49B provided a clear statement of public policy with respect to *all* employers who discriminated based on sex, despite the fact that Section 15(b) of FEPA explicitly exempted employers with fewer than fifteen employees from the administrative process of the Act. *Id.* at 628, 672 A.2d at 612. While such employers were exempted *from the process* under Section 15(b) of FEPA, they were not exempted *from the policy* articulated in Section 14, which, generally speaking, "assures all persons equal opportunity in receiving employment." [7] *Id.* The Legislature clearly articulated its policy with respect to equal opportunity in employment under FEPA; pursuant to this policy, we held that Molesworth's wrongful discharge cause of action was viable. *Id.* at 637, 672 A.2d at

---

7. Section 14 of Fair Employment Practices Act specifically provides,

*It is hereby declared to be the policy of the State of Maryland,* in the exercise of its police power for the protection of the public safety, public health and general welfare, for the maintenance of business and good government and for the promotion of the State's trade, commerce and manufacturers *to assure all persons equal opportunity in receiving employment* and in all labor management-union relations *regardless of race, color, religion, ancestry or national origin, sex, age, marital status, or physical or mental handicap* unrelated in nature and extent so as to reasonably preclude the performance of the employment, and to that end *to prohibit discrimination in employment by any*

616; *see Watson v. Peoples Sec. Life Ins. Co.*, 322 Md. 467, 480–81, 486, 588 A.2d 760, 766, 769 (1991)(recognizing a wrongful discharge claim insofar as the discharge was motivated by the employee's lawsuit against a co-worker for sexual harassment (which amounted to assault and battery) because employees have a right to bring a civil action for sexual harassment and the "same clear public policy . . . makes tortious a discharge that retaliates against that recourse").

We have similarly concluded that a wrongful discharge cause of action based on a public policy violation existed when an employee was discharged solely because that employee filed a workers' compensation claim. *See Finch v. Holladay–Tyler Printing, Inc.*, 322 Md. 197, 202, 586 A.2d 1275, 1278 (1991); *Ewing*, 312 Md. at 50, 537 A.2d at 1175. The policy mandate, pursuant to Maryland Code (1957, 1985 Repl.Vol.), Article 101, Section 39A, explicitly prohibited discharging an employee for filing workers' compensation claims.[8] While Section 39A created a criminal cause for those employers who violate the mandate, we held a civil remedy to exist in the tort of wrongful discharge because of the clearly articulated policy mandate provided by the Legislature with respect to the filing of workers' compensation claims. *Finch*, 322 Md. at 202, 586 A.2d at 1278; *Ewing*, 312 Md. at 50, 537 A.2d at 1175.

Constitutional provisions and principles also provide clear public policy mandates, under which a termination may be grounds for a wrongful discharge claim. In *DeBleecker v. Montgomery County*, 292 Md. 498, 438 A.2d 1348 (1982), we held that the common law rule that an at-will public employee may be discharged at any time was inapplicable if the dis-

---

*person, group, labor organization, organization or any employer or his agents.*
Maryland Code (1994 Repl.Vol., 1995 Supp.) Art. 49B (emphasis added).

**8.** Article 101, Section 39A, in effect during the *Finch* case, was repealed in its entirety in 1996. See 1996 Md. Laws, ch. 10, § 15. The provision prohibiting the discharge of an employee for filing a workers compensation claim is now found in Section 9–1105 of the Labor and Employment Article.

charge was made as a result of an employee's exercise of his constitutionally protected First Amendment rights.[9] *Id.* at 506, 438 A.2d at 1352–53. Similarly, our colleagues in the Court of Special Appeals recognized a public policy mandate based on a citizen's right to privacy in *Kessler v. Equity Management, Inc.,* 82 Md.App. 577, 572 A.2d 1144 (1990). Kessler, a rental agent for an apartment complex, was fired after she refused to enter the apartments of tenants whose rent was overdue to "snoop" through private papers in search of information regarding their place of employment, wages, etc.[10] *Id.* at 582, 572 A.2d at 1147. The intermediate appellate court held that there existed both statutory and constitutional protections against such invasions of privacy; as such, had Kessler carried out the instructions of her employer, she could have been subject to civil liability. *See id.* at 587, 572 A.2d at 1149; *see also Widgeon v. Eastern Shore Hosp. Ctr.,* 300 Md. 520, 529–30, 479 A.2d 921, 925–26 (1984)(explaining that Maryland recognizes a common law civil cause of action for conduct violative of state constitutional rights). Therefore, firing a person who refuses to commit an unlawful act—an act which violates another's constitutionally or statutorily protected legal rights—may contravene public policy. *See Kessler,* 82 Md.App. at 590, 572 A.2d at 1151; *see also Adler,* 291 Md. at 39–41, 432 A.2d at 469–70.

C. Reporting of Co-worker's Suspected Criminal Activity— "Whistleblower" Protection

 Discussing, as we have, our prior bases for defining a public policy mandate under which a wrongful discharge claim

---

**9.** The *DeBleecker* case was not presented on wrongful discharge grounds, but rather DeBleecker contested the employer's violations of his First Amendment rights, as evidenced by his (allegedly unlawful) termination.

**10.** The Court of Special Appeals made a point of noting that the conduct in which Kessler was ordered to engage was much more grievous than mere trespass because Kessler was ordered to "rummage through the tenants' personal papers and effects to gather information that might be useful to the landlord." 82 Md.App. at 588, 572 A.2d at 1150.

may be pursued is intended not only to provide a historical development of this tort, but also to help demonstrate long-standing prerequisites for recognition of a public policy exception to the at-will employment doctrine, and hence, the propriety of adopting a policy mandate similar to that which is sought by the petitioner today, but for which he is not eligible. We explain.

First, no statutory impediment to the tort cause of action sought by the petitioner exists because the Legislature, quite simply, has declined to provide a statutory remedy for *private* employee-whistleblowers.[11] Therefore, the purpose for recognizing the wrongful discharge tort—i.e. to provide a remedy for an otherwise unremedied violation of public policy—has maintained its vitality.

Second, and most significantly, an express statutory mandate provides a discernible foundation for the public policy exception sought by the petitioner; namely, the Legislature has created a misdemeanor offense for a person who harms or injures another's person or property in retaliation for report-

---

**11.** We recognize that *public* employees of the executive branch are protected under Sections 5–301–313 of the State Personnel and Pensions Article for reporting, among other things, violations of laws, abuses of authority, and gross mismanagement of funds, which demonstrates the State's considerable interest in protecting the public from misconduct in government agencies. *See* Md.Code (1993, 1997 Repl. Vol.), § 5–305 of the State Personnel and Pensions Article. The Legislature has acted to protect *private* employee-whistleblowers from subsequent discharge in two circumstances: pursuant to Article 49b, Section 16(f) of the Maryland Code (1957, 1998 Repl.Vol.)(reporting discrimination practices) and Section 5–604(b) of the Labor and Employment Article (1991, 1999 Repl.Vol.)(reporting violations of the occupational safety and health regulations).

The General Assembly recently passed legislation which protects health care workers from retaliation for refusing to commit unlawful acts or reporting the commission of unlawful acts. *See* 2002 Md. Laws, ch. 504. Furthermore, the General Assembly added a provision to Section 5–307 of the State Personnel and Pensions Article which authorizes employees of the University of Maryland and Morgan State University to file grievances either under Section 5–309 or under Title 13 or 14 of the Education Article, respectively. *See* 2002 Md. Laws, ch. 118

ing a crime. *See* Md.Code, Art. 27, § 762 (1957, 1996 Repl. Vol., 2001 Supp.).[12] Section 762 specifically provides:

(a) *Prohibited acts.*—A person may not intentionally harm or injure any person or damage or destroy any property with the intent of retaliating against a victim or witness for giving testimony in an official proceeding or for reporting a crime or delinquent act.

(b) *Penalty.*—A person who violates this section is guilty of a misdemeanor and upon conviction shall be sentenced to imprisonment for not more than 5 years.

A "witness" is defined as a person who:

(1) Has knowledge of the existence of facts relating to a crime or delinquent act;

(2) Makes a declaration under oath that is received as evidence for any purpose;

(3) Has reported a crime or delinquent act to a law enforcement officer, prosecutor, intake officer, correctional officer, or judicial officer; or

(4) Has been served with a subpoena issued under the authority of a court of this State, of any other state, or of the United States.

*See* Md.Code(1957, 1996 Repl.Vol., 2001 Supp.), Art. 27, § 760(e).

The particular definitions of witness which are germane to the prohibition in Section 762 are found in subsections (2) and (3) of Section 760(d): A witness who "[m]akes a declaration under oath that is received as evidence for any purpose" pursuant to Section 760(d)(2) is a witness against whom retaliation is prohibited for "giving testimony in an official proceeding" pursuant to Section 762(a). A witness who

---

12. The Legislature recently added a new Criminal Law Article to the Maryland Code, whereby it repealed Article 27 of the Maryland Code and re-enacted the provisions under new statutory designations in the Criminal Law Article. *See* 2002 Md. Laws, ch. 26. The Act will take effect on October 1, 2002. *Id.* at § 16. The provisions relevant to the present case, i.e. Sections 760–764, will be re-enacted as Sections 9–301–304 of the Criminal Law Article, respectively.

"[h]as reported a crime or delinquent act to a law enforcement officer, prosecutor, intake officer, correctional officer, or judicial officer" pursuant to Section 760(d)(3) is a witness against whom retaliation is prohibited for "reporting a crime or delinquent act." Md.Code, Art. 27, § 762(a). From these statutory provisions, a clearly definable public policy goal is derived: the Legislature sought to protect those witnesses *who report suspected criminal activity to the appropriate law enforcement or judicial authority* from being harmed for performing this important public task. From this clearly definable public policy, we are able to adopt a civil cause of action in wrongful discharge for employees who are discharged for reporting suspected criminal activity to the appropriate authorities.[13]

It appears, then, that the Legislature has created a cognizable statutory interest in the ability to report crimes or testify at an official proceeding without fear of retaliation in terms of

---

13. The Arkansas Supreme Court similarly established public policy favoring employee informants in *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988), where an employee was allegedly discharged because the employer believed he had reported the company to the General Services Administration for submitting false information. *Id.* at 381. The Arkansas Court, agreeing that "the public policy of a state is found in its constitution and statutes," based its public policy exception on a statute—markedly similar to Maryland's—which makes it a misdemeanor to retaliate against witnesses or informants. *Id.* at 385.

Of course, the protection afforded to those who report criminal activity would be eliminated should such report prove to be false, in accordance with Article 27 Section 150(a), which provides:

A person may not make a false statement, report or complaint, or cause a false statement, report or complaint to be made, to any peace or police officer of this State, of any county, city or other political subdivision of this State, or of the Maryland–National Capital Park and Planning Police knowing the same, or any material part thereof, to be false and with intent to deceive and with intent to cause an investigation or other action to be taken as a result thereof.

The Legislature's strong public interest in prohibiting false police reports, *See Choi v. State*, 316 Md. 529, 547, 560 A.2d 1108, 1116–1117 (1989)(stating that "in enacting this statute, the General Assembly intended to proscribe false reports of crimes and other statements which instigate totally unnecessary police investigations"), clearly supercedes any concern for retaliatory discharges that may ensue as a result of these false reports.

personal or property damage. Similar to our decision in *Ewing, supra,* where we held that while Article 101, Section 39A created a criminal cause against those employers who discharge an employee for filing workers' compensation claims, the tort of wrongful discharge provides a civil remedy, *see Ewing,* 312 Md. at 49–50, 537 A.2d at 1174–75, we now conclude that while Section 762 creates a criminal cause against those who retaliate against witnesses who report crimes, the tort of wrongful discharge provides a civil remedy.[14] *See Makovi,* 316 Md. at 612, 561 A.2d at 183 (discussing

---

**14.** We explained in *Makovi v. Sherwin–Williams, supra,* and therein cited several jurisdictions which agreed, that when the statute, which evidences the public policy, itself provides a remedy for wrongful discharge, then a further remedy, at common law, is unnecessary. *See generally Makovi,* 316 Md. at 613–19, 561 A.2d at 184–87. This is because the "creation of a new common law action based on the public policy expressed in the statute. would interfere with that remedial scheme," *id.* at 618, 561 A.2d at 186 (quoting *Melley v. Gillette Corp.,* 19 Mass.App.Ct. 511, 475 N.E.2d 1227, 1229 (1985)), and more specifically because it would have upset "the balance between right and remedy struck by the Legislature in establishing the very policy relied upon." *Id.* at 626, 561 A.2d 179, 561 A.2d at 190.

Along those lines, we recognize that Article 27, Section 763 provides courts "with jurisdiction over a criminal matter" the authority "to stop or prevent the intimidation of a ... witness or a violation of ... § 762 of this subheading." Md.Code, Art. 27, § 763(b). The creation of a new common law action in this case, however, does not interfere with any remedial scheme imposed by the Legislature, and thus is distinguishable from *Makovi.* Section 763 authorizes courts to provide injunctive relief *in criminal matters* by ordering that one party perform or desist from a particular act. The Legislature explicitly limited this injunctive authority to those courts "with jurisdiction over a criminal matter." Md.Code, Art. 27, § 763(b); *see also* 1993 Md. Laws, ch. 223 (explaining the purpose of the Act as "authorizing courts with criminal jurisdiction to issue certain orders to stop or prevent certain violations of law or the intimidation of a victim or witness"). Thus, if a court has jurisdiction in a criminal matter in which witnesses or victims are being retaliated against or intimidated, the court may issue an order to "stop or prevent the intimidation" or retaliation. The tort of wrongful discharge, on the other hand, also provides redress to an injured employee where the circumstances have not evolved into a "criminal matter."

That *any* remedy exists does not, itself, prohibit this Court from holding that a common law remedy may exist as well. While we must cautiously avoid both interference with a remedial scheme provided for by the Legislature and upsetting the balance between right and remedy

this Court's holding in *Ewing* and noting that a criminal statutory sanction would not preclude the wrongful discharge tort). Thus, we hold that terminating employment on the grounds that the employee (as a victim or witness) gave testimony at an official proceeding or *reported a suspected crime* to the appropriate law enforcement or judicial officer is wrongful and contrary to public policy.

This conclusion is in line with our analysis in *Molesworth, supra*, in which the decisional issue was whether Section 14 of Article 49B provided a "sufficiently clear mandate of public policy" to support a common law wrongful discharge cause of action. *See* 341 Md. at 630, 672 A.2d at 613. We resolved to determine whether the specific term "employer" as used in Section 14, included those employers who were exempt by Section 15(b). In so doing, we used the plain language of the statute to discern the legislative intent, namely that *any* employer was prohibited from discriminating in employment decisions. *Id.* at 630–31, 672 A.2d at 613; *see also id.* at 632, 672 A.2d at 614 (stating that "where a public policy is as pervasive as Maryland's policy against sex discrimination, we presume the legislature does not intend to allow violations of that policy, absent some indication of a contrary intent"). Similarly, in the case *sub judice*, we use the plain language of

as established by the Legislature, we shall not unduly limit the common law civil remedy where the Legislature only has explicitly provided for a limited remedy in criminal matters. We similarly noted that contract remedies did not prevent the tort of wrongful discharge from lying because "contract remedies ordinarily are intended to protect the expectation interest of the promisee ... [and] are not intended to vindicate specific public policies." *Makovi*, 316 Md. at 612, 561 A.2d at 183 (discussing our decision in *Ewing v. Koppers Co.*, 312 Md. 45, 537 A.2d 1173 (1988), where we held that the availability of contract remedies to a contractual employee who was protected by a collective bargaining agreement did not prevent the tort of wrongful discharge from lying). Article 27 Section 763 does not provide any remedy for a wrongful retaliatory discharge rather it only grants courts with criminal jurisdiction the authority "to prevent intimidation of [a] victim or witness." Md.Code, Art. 27, § 763. The "remedy" provided in Section 763 does not vindicate the specific public policy illustrated in Section 762; thus, a tort remedy is appropriate in cases of wrongful discharge for those who report suspected criminal activity.

Article 27, Section 762 to discern that the Legislature intended to preclude retaliation against those who report criminal activity.

That we so hold, however, does not mean that the petitioner has a successful claim for wrongful discharge. To qualify for the public policy exception to at-will employment, the employee must report the suspected criminal activity to the appropriate law enforcement or judicial official, not merely investigate suspected wrong-doing and discuss that investigation with co-employees or supervisors.[15] *See Faust v. Ryder*

---

**15.** The petitioner testified that he never notified law enforcement authorities about his suspicions regarding the store manager. The petitioner stated that had his suspicion risen to the level of probable cause, he would have been able to act under his own authority as a deputy sheriff; at no time during the investigation of the store manager, however, did he believe probable cause existed to arrest or formally accuse the store manager of theft, nor do we address his contention that he would have been able to act under his authority.

We acknowledge that some jurisdictions find the distinction between internal investigating and external reporting to be irrelevant. For example, in *Sullivan v. Massachusetts Mut. Life Ins. Co.*, 802 F.Supp. 716 (D.Conn.1992), the federal court, in a prospective opinion concerning Massachusetts law, considered the internal whistleblowing claim of a former employee. *Id.* at 718. The employer contended that the plaintiff had not made a sufficient claim because the suspected violations were not reported to outside authorities, and the plaintiff never threatened to speak of the suspected violations to any authorities. *Id.* at 724. The court agreed with the plaintiff, finding that internal whistleblowing was sufficient and said:

This rule makes sense. A rule that would permit the employer to fire a whistleblower with impunity before the employee contacted the authorities would encourage employers promptly to discharge employees who bring complaints to their attention, and would give employees with complaints an incentive to bypass management and go directly to the authorities. This would deprive management of the opportunity to correct oversights straightaway, solve the problem by disciplining errant employees, or clear up a misunderstanding on the part of a whistleblower. The likely result of a contrary rule would be needless public investigations of matters best addressed internally in the first instance. Employers benefit from a system in which the employee reports suspected violations to the employer first; the employee should not, in any event, be penalized for bestowing that benefit on the employer.

*Id.* at 724–25. Whether the United States District Court for the District of Connecticut's hypothesis on how the requirement of external reporting may impact the internal employee reporting has any merit is

*Comm. Leasing & Servs.,* 954 S.W.2d 383, 391 (Mo.Ct.App.1997)(recognizing that a wrongful discharge claim may exist where there is a clear mandate of public policy and where the " 'whistleblowing' actually occurred in that [the employee] reported the alleged criminal wrongdoing to the *proper authorities* ")(emphasis added).

In the limited times that the Legislature has enacted whistle-blower protection to protect *private* employees, the protection is only valid when the employee/whistle-blower reports the suspect activity externally. For example, Section 5–604(b) of the Labor and Employment Article protects an employee who files a complaint or brings an action for violations of the Occupational Safety and Health title by his or her employer. Maryland's anti-discrimination laws protect private employees who have opposed any unlawful discriminatory practice in which the employer engages, or reported or participated in an investigation or proceeding concerning the employer's discriminatory practices. *See* Md.Code, Art. 49b, § 16(f).[16] Similarly, with respect to Article 27, Section 762, the Legislature created a clear and unmistakable prohibition against retaliating against a person who reports criminal activity, externally, to the appropriate law enforcement authorities. We believe a corresponding common law cause of action must also require external reporting to the appropriate law enforcement authorities.

The petitioner argues that his employment as an Anne Arundel County Sheriff's Deputy should affect the duties and obligations he undertook as a security officer at

---

inapposite. We refuse to create a public policy grounded only in mere supposition about the employer/employee relationship; the public policy mandates in this State must be based on some discernible principle of law as articulated by the Legislature or the courts.

**16.** Certain disclosures by public employees also must be to an external authority, namely the Attorney General. Sections 5–306 and 5–313 of the State Personnel and Pensions Article provide that disclosures that are otherwise prohibited by law must be made to the Attorney General in order for the protections guaranteed to all public employees by Section 5–305 to apply.

64

Sears; i.e., he was not merely carrying out his duties as a
security officer in investigating employee theft at Sears, but
rather he also had a duty to investigate criminal acts as a
sworn deputy with the Sheriff's Office. As the Court of
Special Appeals correctly observed, however,

> [The petitioner] conceded ... that he was acting at all times
> relevant to his case as an employee of Sears, that his
> investigation of the store manager was outside of his duties
> as a sheriff's deputy, and that he never had probable cause
> to suspect that the store manager had committed a crime,
> so as to trigger his duties as a deputy sheriff. Therefore,
> any legal duties that Wholey may have had in his role as a
> deputy sheriff were not implicated by his investigation of
> the store manager.

*Wholey,* 139 Md.App. at 662–63 n. 7, 779 A.2d at 420 n. 7.
Granted, one may have a viable claim of wrongful discharge if
terminated for acting pursuant to a legal duty when the
employee's failure to perform that duty could result in poten-
tial liability. *See Thompson v. Memorial Hosp.,* 925 F.Supp.
400, 407–08 (D.Md.1996)(finding that the legal duty to report
the misadministration of radiation belonged to the hospital as
the licensee under the regulation, COMAR 26.12.01.01, § D.
409(b), and not the employee-physicist; therefore the employ-
ee could not claim protection from wrongful discharge under a
public policy mandate); *Bleich v. Florence Crittenton Serv.,* 98
Md.App. 123, 138–40, 632 A.2d 463, 470–71 (1993)(recognizing
a wrongful discharge claim for an educator terminated for
filing a report for child abuse and neglect, as she was explicit-
ly required to do by Maryland law, COMAR 07.02.23.01.A and
COMAR 07.02.23.06D(1)(c)); *see also Shapiro v. Massengill,*
105 Md.App. 743, 768–69, 661 A.2d 202, 215, *cert. denied,* 341
Md. 28, 668 A.2d 36 (1995)(refusing to consider a claim of
wrongful discharge "absent some clear mandate" or duty
which the employee himself "actually could be held responsi-
ble" for breaching). The petitioner cannot point to any stat-
ute or regulation pertaining to his duties as either a Sears
security officer or a deputy sheriff that would have held him

accountable for failing to investigate or report the suspicious activity of the store manager.

We also shall consider the purpose of the petitioner's duties because such purpose, particularly as it relates to the general public, has also been a consideration in some jurisdictions. For example, the Connecticut Supreme Court, in *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980), found a valid cause of action for wrongful discharge when an employee was fired for attempting to ensure that the employer's product complied with labeling and licensing laws of the state. As the "quality control director" of the company, the employee maintained responsibility for ensuring compliance with the regulations to which the company was bound under the Connecticut Uniform Drug and Cosmetic Act. *Id.* at 388. Therefore, the court stated that, "an employee should not be put to an election whether to risk criminal sanction or to jeopardize his continued employment." *Id.* at 389. Contrary to the Connecticut case, the petitioner in the present case would not have risked criminal sanction for failing to pursue, on his employer's request, the continued investigation of the store manager. The reporting duties of the petitioner and Sheets are distinguishable. The petitioner was tasked with protecting the property of Sears from theft by customers and employees, and without question, in investigating the store manager, the petitioner was fulfilling the specific duties for which he was hired. The purpose of this duty, however, was to guard the private proprietary interests of Sears; Sheets, on the other hand, was responsible for ensuring compliance with a Connecticut regulation enacted to protect consumers, and thus the public, as a whole. Therefore, the petitioner cannot seek solace in the fact that his duties required him to investigate possible thefts.

Nor can the petitioner seek protection from an esoteric theory about acting in the "public good" by *investigating* criminal activity. The public good is best served by *reporting* suspected criminal activity to law enforcement authorities; an action which the petitioner, in this case, did not take. Granted, in order to report some suspected criminal activity a

certain amount of marshaling of the facts may occur, but the mere recognition of a potential problem and gathering of information are not per se in the public interest. Furthermore, we decline to create a tort cause of action based *solely* on transcendental notions of that which is in the public interest, particularly when our own Legislature has declined to make individual citizens criminally responsible for failing to investigate or report criminal activity. In *Pope v. State*, 284 Md. 309, 352, 396 A.2d 1054, 1078 (1979), we noted:

> If the Legislature finds it advisable that the people be obligated under peril of criminal penalty to disclose knowledge of criminal acts, it is, of course, free to create an offense to that end, within constitutional imitations, and, hopefully, with adequate safeguards.

To date, our Legislature has not so acted, *except to protect those who do report* criminal activity from retaliation. This Court now adopts a public policy mandate for employees who report criminal activity to the appropriate law enforcement authorities; we use caution, however, when considering a case on which the petitioner primarily relies, *Palmateer v. Int' l Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981). The Illinois court in *Palmateer* held that the reporting of any type of crime is protected because the act of investigating and reporting criminal activity is, in and of itself, a public good. *See Palmateer*, 52 Ill.Dec. 13, 421 N.E.2d at 879–80. While the factual circumstances in *Palmateer*—an employee who was discharged after reporting to local law enforcement authorities that a fellow employee might be violating the criminal code—may appear to harmonize with our holding today, the means by which the Illinois court arrived at this conclusion do not. The *Palmateer* court based its holding entirely on abstract notions of that which constitutes the public good. As the criticism extended by the dissent in *Palmateer* similarly alludes, such a policy mandate was unsupported by any legislative enactment and was grounded only in the obscure belief that public policy insists that all citizens become crime-fighters. *See Palmateer*, 52 Ill.Dec. 13, 421

N.E.2d at 884. The "ends" may be similar, but the "means" by which we achieve those ends are vastly different.

Our decision today is grounded in, and supported by, a legislative enactment from which a public policy mandate clearly emanates. We refuse to take the specific factual circumstance before us and induce from it an all-encompassing exception, as the petitioner would like, which declares that the act of *investigating* criminal activity is a *per se* public benefit, the termination for which, is actionable in tort law. Our legislature has declined to encroach upon the employment decisions of private companies through creation of a general all-encompassing "whistleblower protection" statute which would protect employees who investigate and internally report suspected criminal activity; we, in turn, decline to act in its stead.[17] *See Adler*, 291 Md. at 45, 432 A.2d at 472 (stating

---

**17.** Fewer than half (approximately 23) of the state jurisdictions have comprehensive whistleblower statutes which cover private employees as well as public employees. *See e.g.* Ariz Rev Stat. Ann § 23–1501 (West 2001 Supp.); Cal Lab Code § 98.6 (West 1989); Conn Gen.Stat. § 31–105 (1997)(declares retaliation to be an unfair labor practice); Conn. Gen.Stat. § 31–51m (1997)(right of employee to bring civil action); Haw.Rev.Stat. § 378–61–69 (1993 Repl.Vol.); Ky Rev.Stat Ann. § 337.990 (Michie 2001 Repl.Vol.); La.Rev.Stat. Ann § 23:967 (West 1998); Me Rev.Stat. Ann tit. 26, § 831–840 (West 1988); Mich. Comp. Laws § 15.361–369 (1994); Minn.Stat § 177.32 (1993); Mont.Code Ann § 39–2–904 (2001)(creating wrongful discharge claim, including for "retaliation ... for reporting a violation of public policy"); Neb.Rev. Stat. § 48–1227 (1998); N.H.Rev Stat Ann. § 275.E1–E7 (1999 Repl. Vol.); N.J. Stat. Ann. § 34:19–(1–9)(West 2000); N.Y. Labor Law § 740 (McKinney 2002 Supp.); N.D. Cent.Code § 34–01–20 (2001 Supp.); Ohio Rev Code Ann § 4113.51–53 (Anderson 2001 Repl.Vol.)(all employees); Ohio Rev.Code Ann. § 4167.13 (Anderson 2001 Rep. Vol.)(state employees); Or.Rev.Stat Ann § 659A.230 (2001); 43 Pa. Cons.Stat. § 1421–28 (1991); S.D. Codified Laws § 28–1–45.7 (Michie 1992)(nursing home employees protected); Tenn.Code Ann. 50–1–304 (1999 Repl. Vol.); Tex. Lab.Code Ann § 21.055 (West 1996)(declaring retaliation against employees for reporting violation to be an unfair employment practice); Vt Stat. Ann. tit. XXI, § 232 (2001 Supp.)(creating private right of action for employees suffering retaliation); Wis. Stat § 111.36 (1997)(declaring retaliation for reporting discrimination or harassment to be an unfair employment practice).

Meanwhile, most jurisdictions—including Maryland—provide protection for state employees who report the wrong-doing of other state employees. *See e.g.* Ala.Code § 36–25–24 (2001 Repl.Vol.) (reporting

that "declaration of public policy is normally the function of the legislative branch" and thus concluding that while a cause of action may be recognized at common law, the basis for that cause of action must come from some clear mandate of public policy). The Legislature clearly intended, however, to preclude retaliation for the *reporting* of criminal activity by creating a criminal cause against those who violate the mandate. We similarly limit the public policy exception to those who *report* criminal activity to the appropriate authorities.

We digress momentarily to address concerns that our prior decision in *Adler, supra,* may appear to preclude the holding we adopt today. In *Adler* we neglected to find a cause of action for wrongful discharge when the employee reported

violations of ethics code for public officials); ALASKA STAT. § 23.40.110 (Michie 2000)(reporting by state employees); ARIZ.REV.STAT. ANN. § 38–532 (West 2001)(whistleblowing by state employees); ARK.CODE ANN. § 8–7–1010 (Michie 2000 Repl.Vol.)(public employees chemical exposure right to know act); ARK.CODE ANN § 11–10–106 (Michie 2000 Repl.Vol.)(protection for all employees who report false statements made by employers to state agency); COLO.REV.STAT. § 24–50.5–101–107 (2001)(reporting by state employees); FLA. STAT Ch. § 112.3187 (2002 Supp.)(whistleblowing by state employees); IDAHO CODE § 6–2101 (1997)(whistleblowing by public employees protected); IND.CODE § 4–15–10–4 (1996)(public employees protected); IOWA CODE § 19A.19 .(2001)(state personnel protected); KAN. STAT. ANN. § 75–2973 (1997)(protection for public employees who report violation to legislators); KY. REV.STAT. ANN. § 61.102 (Michie 1993)(public employees); ME.REV.STAT. ANN. tit.5 § 23 (West 2002)(state employees); MASS. GEN. LAWS ch. 150E § 10 (1999)(public employees); MISS.CODE ANN. § 25–9–171 et. seq (1999)(reporting to investigative or agency authorities); MO.REV.STAT. § 105.055 (2002 Supp.)(state employees); MONT.CODE ANN. § 39–31–401 (2001)(state employees); NEV.REV.STAT. ANN. § 288.270 (Michie 2002 Repl.Vol.)(government employees); NEV REV.STAT. § 281.611 (Michie 2002)(defining reportable "improper governmental action"); N.C. GEN. STAT § 126–17 (2001) and § 126–(84–88)(2001)(public protection for reporting improper government activities); OKLA. STAT tit. 74 § 840–2.5 (2002)(public employees); R.I. GEN. LAWS § 28–50–(1–9)(2000)(public employees); S.C.CODE ANN. § 8–27–20 (West 2001 Supp.) (state employees); TEX. LOC. GOV'T CODE ANN. § 160.006 (West 1999)(municipal employees); UTAH CODE ANN. § 67–21–1 et. seq. (2000)(public employees reporting violations of state or federal law); WASH. REV.CODE § 42.40.010–.050 (1991, 1998 Supp.)(public employee whistleblower protection); WASH. REV CODE § 42.41.010–.902 (2000)(local government employee whistleblower protection); W.VA.CODE § 6c–1–(1–8) (2000 Repl.Vol.)(public employees).

illegal practices by management to his supervisors because "Adler fail[ed] to provide any factual details to support the general and conclusory averments ... [n]or [did] he point to any specific statutory provision ... that particularly prohibits the claimed misconduct." 291 Md. at 46, 432 A.2d at 472. The critical distinguishing factor between *Adler* and the case *sub judice* is at the time *Adler* was decided, the Legislature had not enacted the provision prohibiting retaliation against a witness for reporting a crime. Section 762, originally enacted as Section 768, *see* Md.Code (1957, 1992 Repl.Vol., 1993 Cum. Supp.), Art. 27, § 768, did not take effect until October of 1993. *Id.* Prior to the Acts of 1993, the Legislature had only prohibited intimidating, influencing or corrupting jurors or witnesses in the "discharge of his duty," i.e. as a juror deciding the outcome of a case or a witness giving testimony, *see* Md.Code (1957, 1992 Repl.Vol.), Art. 27, § 27, therefore, no public policy mandate regarding the reporting of criminal activity was discernible.[18]

18. We also acknowledge the Fourth Circuit Court of Appeals's correct application of Maryland law with respect to the purported public policy mandate favoring investigation and reporting of criminal activity. After our answer of the certified question presented in *Adler*, and after trial in federal court, *Adler v. American Standard Corp.*, 538 F.Supp. 572 (D.Md.1982)(*Adler II* ), the Fourth Circuit considered whether an employee's termination which was motivated by retaliation for his disclosure of wrongdoing to higher corporate officers violated Maryland public policy. *Adler v. American Standard Corp.*, 830 F.2d 1303, 1303–04 (4th Cir.1987)(*Adler III* ). The Fourth Circuit, employing our guidance from *Adler I*, properly determined that a discharge resulting from an employee's investigation of, or intention to "blow the whistle on," illegal activities was not in contravention to Maryland public policy because the employee was not performing a legal right or duty, nor was he refusing to engage in an illegal or wrongful activity. *Id.* at 1307.

Similarly, in *Milton v. IIT Research Inst.*, 138 F.3d 519 (4th Cir.1998), the Fourth Circuit properly delineated the primary factors which define the scope of Maryland public policy mandates for wrongful discharge claims. Applying Maryland law, the Fourth Circuit explained that Maryland's public policy mandate generally only applies "where an employee has been fired for refusing to violate the law or the legal rights of a third party ... [or] where [an] employee has been terminated for exercising a specific legal right or duty." *Id.* at 522 (internal quotations and citations omitted). Thus, in Milton's case, where he was discharged for informing management of the company's unlawful prac-

Again, while no legal duty to report criminal activity exists in Maryland, at least with respect to the factual circumstances before us, the Legislature has determined that one who reports criminal activity to appropriate authorities should be statutorily protected from retaliation for such conduct. Therefore, we conclude that a public policy mandate exists for employees who report criminal activity to the appropriate authorities and are subsequently discharged from employment on this basis. We decline the petitioner's invitation to adopt a broader public policy mandate for conduct encompassing the investigation of suspected criminal activity of an employee, being of the opinion that such a significant change in our law is best left to the Legislature. *See Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 514 N.Y.S.2d 209, 506 N.E.2d 919, 922, 923 (N.Y.1987)(refusing to recognize a tort cause of action for wrongful discharge in violation of public policy for a whistle-blower who reported illegal tax avoidance schemes to his supervisor, stating that "significant alteration of employment relationships ... is best left to the Legislature ... because stability and predictability in contractual affairs is a highly desirable jurisprudential value" and further noting that its Legislature had appropriately responded by enacting a myriad of statutes to protect at-will employees from terminations which run contrary to public policy)(citing *Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983)). Furthermore, as the Supreme Court of California declared in *Gantt v. Sentry Ins.,* 1 Cal.4th 1083, 4 Cal.Rptr.2d 874, 824 P.2d 680 (1992):

A public policy exception carefully tethered to fundamental *policies that are delineated in constitutional or statutory provisions strikes the proper balance among the interests of employers, employees and the public.* The employer is bound, at a minimum, to know the fundamental public

tices with respect to its use or abuse of tax-exempt status in its reports to the Internal Revenue Service, the Fourth Circuit refused to find a violation of Maryland public policy for "whistle-blowing," particularly when the employee had *no legal duty to report the criminal activity. Id.* at 521.

policies of the state and nation as expressed in their constitutions and statutes; so limited, the public policy exception presents no impediment to employers that operate within the bounds of law. Employees are protected against employer actions that contravene fundamental state policy. And society's interests are served through a more stable job market, in which its most important policies are safeguarded.

*Id.* at 687–88 (emphasis added).

We believe that the proper balance is achieved by proceeding cautiously when called upon to declare public policy absent some legislative or judicial expression on the subject and in so doing, we limit the adoption of a tort cause of action for wrongful discharge to circumstances where an employee reports criminal activity to the proper authorities and is discharged as a result of this reporting. *See Ewing,* 312 Md. at 49, 537 A.2d at 1175 (explaining that the recognized tort action was not intended to reach every wrongful discharge, but rather only those where a clear mandate of public policy is violated).

### *JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED WITH COSTS.*

RAKER and WILNER, JJ. concur.

BELL, C.J. And Eldridge, J. dissent.

Concurring opinion by RAKER, Judge., in which WILNER, Judge., joins.

I join in the judgment of the plurality opinion affirming the judgment of the Court of Special Appeals. Unlike the plurality, I would affirm on the basis of the well-reasoned opinion of the Court of Special Appeals.

The plurality holds that "a clear public policy mandate exists in the State of Maryland which protects employees from a termination based upon the reporting of suspected criminal activities to the appropriate law enforcement authorities." See ante at 43. The case before us, however, involves an

employee reporting to his supervisors, *not* to law enforcement officials. There is no clear public policy mandate that protects workers who report suspected crimes to their superiors. Therefore, I would not reach out to create a new exception to the at-will employment doctrine in a case not ripe for such decision. Inasmuch as the plaintiff herein has not stated facts to justify any exception to the at-will employment doctrine, this Court should not introduce expansive public policy dicta into the opinion. The Court pays lip service to the notion that we should proceed cautiously when called upon to declare public policy absent some legislative or judicial expression on the subject. *See* ante at 71. Nonetheless, the Court creates a tort cause of action in a case where the facts alleged by the plaintiff do not constitute a cause of action. *See* ante at 71.

Even if it were necessary to touch on the question addressed by the plurality, I would reach a different conclusion. This Court has recognized an exception to the at-will employment doctrine where the discharge of an employee violates *a clear mandate of public policy. Adler v. American Standard Corp.,* 291 Md. 31, 40, 432 A.2d 464, 469 (1981). This exception, however, is a narrow one. Maryland courts have found a violation of a clear mandate of public policy only in limited circumstances: where an employee has been fired for refusing to violate the law or the legal rights of a third party, *see Kessler v. Equity Management, Inc.,* 82 Md.App. 577, 572 A.2d 1144 (1990) (holding that firing an at-will employee for refusing to commit the tort of invasion of privacy constitutes wrongful discharge), and where an employee has been terminated for exercising a specific legal right or duty. *See Watson v. Peoples Sec. Life Ins. Co.,* 322 Md. 467, 588 A.2d 760 (1991) (holding that is contrary to a clear mandate of public policy for an employer to discharge an employee for seeking legal redress against a co-worker for sexual harassment); *Ewing v. Koppers Co.,* 312 Md. 45, 537 A.2d 1173 (1988) (holding that discharging an employee for filing a worker's compensation claim contravenes clear mandate of public policy); *see also Milton v. ITT Research Inst.,* 138 F.3d 519 (4th Cir.1998);

*Adler v. American Standard Corp.,* 830 F.2d 1303 (4th Cir. 1987).

In the case *sub judice,* the Court of Special Appeals found that petitioner's claim did not fit under either of these categories, and that petitioner was therefore precluded from maintaining a cause of action for wrongful discharge. *Sears v. Wholey,* 139 Md.App. 642, 779 A.2d 408 (2001). I agree with this conclusion.

Even assuming that this Court would recognize an exception to the at-will employment doctrine in a case where an employee is required to report a crime to the authorities and is then discharged by an employer for doing so, the plurality has adopted a much broader exception. The plurality states that "[c]ourts must ... use care in *creating new public policy* ...." Ante at 52, 65 (holding that "[t]his court now adopts a public policy mandate for employees who report criminal activity to the appropriate law enforcement authorities...."). Ironically, it is lack of caution or care that is the Achilles heel of the plurality opinion. In creating exceptions to the at-will employment doctrine, courts do not "create new public policy." Rather, we look to a clear mandate of public policy that necessitates the adoption of an exception to the at-will employment doctrine. *See Makovi v. Sherwin–Williams Co.,* 316 Md. 603, 561 A.2d 179 (1989). This Court should not be creating public policy to justify an exception to the at will employment doctrine. *See Magee v. O'Neill,* 19 S.C. 170, 185 (S.C.1883) (stating that "[t]he subjects in which the court undertakes to make the law by mere declaration of public policy should not be increased in number without the clearest reasons and the most pressing necessity."). This is particularly true in a case where, even if the tort did exist, the facts do not fit the tort.

The plurality's opinion is also out of synch with our precedent regarding wrongful discharge. We have stated that this Court is not confined to legislative enactments, prior judicial decisions or administrative regulations when determining the public policy of this State. *Adler,* 291 Md. at 45, 432 A.2d at

74

472. Recognition of an otherwise undeclared public policy, however, involves "the application of a very nebulous concept to the facts of a given case." *Id.* Therefore, "absent a statute expressing a clear mandate of public policy, there ordinarily is no violation of public policy by an employer's discharging an at-will employee." *See Molesworth v. Brandon,* 341 Md. 621, 630, 672 A.2d 608, 613 (1996) (quoting *Watson v. Peoples Ins. Co.,* 322 Md. 467, 588 A.2d 760 (1991)); *Felder v. Butler,* 292 Md. 174, 184, 438 A.2d 494, 499 (1981) (noting that "[i]n determining the public policy of the State, courts consider, as a primary source, statutory or constitutional provisions.").

The plurality opinion points to Article 27, § 762 in an effort to find statutory support for its conclusion that there is a clear public policy mandate protecting employees who report suspected criminal activity to law enforcement officials. *See ante* at 58. That statute, however, does not place any duty upon an employee and is not an expression of clearly mandated public policy that would support the exception created today. Moreover, the plurality's reading of the statute expands the class of people protected under § 762, which only protects a "victim or witness" who gives testimony or reports a crime.[19] Under the plurality opinion, the protection of the statute applies to *any* employee who reports suspected criminal activity to the appropriate law enforcement officials, irrespective of whether there is a duty to report, or whether the employee was a testifying victim or witness.

Many courts have commented on dangers inherent in judicial involvement in the formation of public policy. Judge Levine, writing for Court in *Maryland–Nat'l Capital Park and Planning Comm'n v. Washington Nat'l Arena,* 282 Md. 588, 386 A.2d 1216 (1978), discussed the meaning of public policy as follows:

19. Section 762(a) reads as follows:
"A person may not intentionally harm or injure any person or damage or destroy any property with the intent of retaliating against a victim or witness for giving testimony in an official proceeding or for reporting a crime or delinquent act."

"Nearly 150 years ago Lord Truro set forth what has become the classical formulation of the public policy doctrine—that to which we adhere in Maryland:

'Public policy is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public, or against the public good, which may be termed, as it sometimes has been, the policy of the law, or public policy in relation to the administration of the law.'

But beyond this relatively indeterminate description of the doctrine, jurists to this day have been unable to fashion a truly workable definition of public policy. Not being restricted to the conventional sources of positive law (constitutions, statutes and judicial decisions), judges are frequently called upon to discern the dictates of sound social policy and human welfare based on nothing more than their own personal experience and intellectual capacity. Inevitably, conceptions of public policy tend to ebb and flow with the tides of public opinion, making it difficult for courts to apply the principle with any degree of certainty.

'[P]ublic policy ... is but a shifting and variable notion appealed to only when no other argument is available, and which, if relied upon today, may be utterly repudiated tomorrow.' "

*Id.* at 605–606, 386 A.2d at 1226 (citations omitted). Thus, in *Adler,* we stated:

"We have always been aware ... that recognition or an otherwise undeclared public policy as a basis of a judicial decision involves the application of a very nebulous concept to the facts of a given case, and that declaration of public policy is normally the function of the legislative branch. We have been consistently reluctant, for example, to strike down voluntary contractual arrangements on public policy grounds."

*Adler,* 291 Md. at 45, 432 A.2d at 472 (citations omitted). *See also Milton,* 138 F.3d at 523 (noting that "[t]his search for a specific legal duty is no mere formality. Rather it limits

judicial forays into the wilderness of discerning 'public policy' without clear direction from a legislative or regulatory search.").

Accordingly, I would decide the case before us and leave for another day the consideration of whether there exists a clear mandate of public policy that would justify an exception in other circumstances.

Judge WILNER has authorized me to state that he joins in the views expressed herein.

Dissenting Opinion by ELDRIDGE, Judge., in which BELL, Chief Judge., joins.

In my view, the decision today and Judge Battaglia's plurality opinion are inconsistent with this Court's holding in *Molesworth v. Brandon*, 341 Md. 621, 672 A.2d 608 (1996). In *Molesworth*, a former employee of a veterinarian brought a common law abusive discharge action against the veterinarian. The former employee claimed that her employment had been terminated because of her gender. This Court, in an opinion by Chief Judge Murphy, held that Maryland Code (1957, 1998 Repl.Vol.), Art. 49B, §§ 14 and 15, prohibiting *employers* from discriminating based on gender, provided "a sufficiently clear mandate of public policy to support Molesworth's common law wrongful discharge cause of action," even though the defendant veterinarian was *not an employer* within the meaning of the statutory provisions. *Molesworth v. Brandon, supra*, 341 Md. at 630–632, 672 A.2d at 613–614.

Similarly, the enactments by the General Assembly protecting various categories of "employee-whistleblowers," cited in the plurality opinion, furnish "a sufficiently clear mandate of public policy to support" the petitioner Wholey's cause of action.

In addition, I continue to disagree with the extremely narrow scope which majorities of this Court have repeatedly accorded the tort of abusive discharge. This Court unanimously recognized the tort of "abusive discharge" in *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981).

Subsequently, however, the Court has so limited the tort action that numerous discharges from employment, which are abusive and clearly contrary to public policy as a matter of common sense, are held to be beyond the scope of the tort. It is illogical to recognize a tort action and then hold that virtually nothing falls within the action. *See Caldor v. Bowden,* 330 Md. 632, 677–678, 625 A.2d 959, 980–981 (1993) (Eldridge, J., joined by Bell, J., dissenting); *Watson v. Peoples Ins. Co.,* 322 Md. 467, 487–493, 588 A.2d 760, 770–772 (1991) (Eldridge, J., dissenting in part); *Chappell v. Southern Maryland Hospital,* 320 Md. 483, 498–503, 578 A.2d 766, 774–776 (1990) (Adkins, J., joined by Eldridge, J., and Cole, J., dissenting); *Makovi v. Sherwin–Williams Co.,* 316 Md. 603, 626–646, 561 A.2d 179, 190–200 (1989) (Adkins, J., joined by Eldridge, J., and Cole, J., dissenting). *See also Insignia v. Ashton,* 359 Md. 560, 574–575, 755 A.2d 1080, 1087–1088 (2000) (Eldridge, J., concurring).

Chief Judge BELL agrees with the views here expressed and joins this opinion.