Dennis P. GLYNN Plaintiff,

v.

EDO CORPORATION,
et al., Defendants.

Civil No. JFM 07–1660.

United States District Court,
D. Maryland.

Feb. 27, 2008.

596

598

Robert Scott Oswald, Gregory Robert Sharma–Holt, The Employment Law Group, PC, Washington, DC, for Plaintiff.

William M Sullivan, Jr., Eric James Marcotte, Ryan S. Spiegel, Sarah Mali Hall, Winston and Strawn LLP, Washington, DC, for Defendants.

## MEMORANDUM OPINION

J. FREDERICK MOTZ, District Judge.

Plaintiff Dennis Glynn ("Glynn") has filed this suit against defendants EDO Corporation ("EDO"), Impact Science and Technology, Incorporated ("IST"), Michael Caprario ("Caprario"), and Dean Puzzo ("Puzzo"), alleging retaliation in violation of the False Claims Act, 31 U.S.C. § 3730 *et seq.*, and wrongful discharge in violation of public policy under New Hampshire and Maryland common law. Glynn seeks reinstatement, economic damages, compensa-

tory damages, non-economic emotional distress damages, punitive damages, costs, fees, attorneys' fees, and injunctive relief. (Third Am. Compl. ¶¶ 185–192.)

A variety of motions are now pending. First, Glynn has filed motions for leave to file a second amended complaint and a third amended complaint. These motions are granted; consequently, Glynn's motion for leave to supplement his opposition to defendants' motion is dismissed as moot. Next, defendants have filed a motion to dismiss for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim upon which relief can be granted. This motion is denied in part and granted in part. Relatedly, Glynn's motions to stay decision on the motion to dismiss and for preliminary discovery on the issue of personal jurisdiction with respect to defendants Caprario and Puzzo are denied. Finally, defendants motion to dismiss Glynn's claim for injunctive relief is granted.

## I.

Glynn, an Air Force veteran and experienced engineer, began working for IST as a Principal Engineer in March 2004 after he sold his own defense contracting company to IST.[1] (Third Am. Compl. ¶ 21.) At all times relevant to this lawsuit, defendants Caprario and Puzzo were IST employees, serving as IST's Program Manager and Information Warfare Director respectively. (*Id.* ¶¶ 40, 25.)

While employed with IST, Glynn worked on a United States government contract to "provide the U.S. Special Operations Command . . . [with] electronic countermeasure systems designed to impair [improvised explosive devices ('IEDs') ]." (*Id.* ¶ 33.) In

---

1. When evaluating a motion to dismiss, a court must "accept the factual allegations of the complaint as true and must view the com-

plaint in the light most favorable to the plaintiff." *GE Inv. Private Placement Partners II v. Parker,* 247 F.3d 543, 548 (4th Cir.2001).

June 2006, Glynn and other IST employees discovered that the countermeasure systems did not function properly at high temperatures; in particular, the devices did not "transmit sufficient power to jam the IEDs." (*Id.* ¶ 41.)

In response to this problem, Glynn and his co-workers developed a solution "which entailed using a temperature component that automatically adjusts the power output level." (*Id.* ¶ 42.) As of late July 2006, this component was being installed in the countermeasure systems that were the subject of the government contract. (*Id.* ¶ 43.) However, Glynn remained concerned about the systems that had previously been manufactured, provided to the government, and presumably "shipped to Iraq without the temperature components that enable the devices to perform in high temperatures." (*Id.* ¶ 44.)

In light of these lingering concerns, Glynn approached Caprario and informed him that the flaw in the systems "called into question all the units shipped to date." (*Id.* ¶ 45.) In response, Caprario and Puzzo "told Glynn that IST would not recall the units and would not notify [the Department of Defense ('DOD')] of the defect.... Caprario specifically told Glynn that IST did not want to 'upset the apple cart right now.'" (*Id.* ¶ 47.) Later, Glynn asked Caprario and Puzzo if he could see the contract documents in order to "determine the extent of IST's violation of the contracts," but both Caprario and Puzzo refused. (*Id.* ¶ 48.)

On or about July 26, 2006, Puzzo told Glynn that IST was going to be sold to EDO and that Glynn would be offered an employee retention agreement to "ensure that he would continue working after the acquisition." (*Id.* ¶ 29.) On September 15, 2006, EDO provided Glynn with a retention agreement offering him $60,000. (*Id.* ¶ 31.) Glynn never signed the agreement. (*Id.* ¶ 113.) Around this time, several employees were removed from Glynn's supervision, allegedly in retaliation for Glynn's continued vocalization of his concerns about the previously-shipped defective systems. (*Id.* ¶ 85.)

On September 11, 2006, Glynn discovered that Caprario and Puzzo were IST stockholders set to benefit from EDO's acquisition of IST. (*Id.* ¶ 52.) On September 15, 2006, EDO finalized its purchase of IST. (*Id.* ¶ 60.) On September 20, 2006, Glynn met with Special Agent Ben Hochberger of the DOD's Office of the Inspector General ("OIG") to inform the government of his employer's actions with respect to the defective systems.[2] (*Id.* ¶ 76.) In early October, Colonel Grisby of the DOD "made an unannounced visit to IST to test the" systems; he tested the repaired systems but not the defective ones that had already been shipped for use in Iraq. (*Id.* ¶¶ 78–79.)

After Colonel Grisby's visit, Glynn was instructed "not to go into the Assembly area or give work to the assemblers."[3] (*Id.* ¶ 86.) On October 11, 2006, Puzzo orchestrated a transfer so that another employee was removed from Glynn's supervision. (*Id.* ¶ 87.) Caprario subsequently stated that Glynn had "drawn a line in the sand" and would be responsible for any repercussions resulting from his conduct. (*Id.* ¶ 88.) In November 2006, IST management ordered employees not to associate with Glynn. (*Id.* ¶ 89.) On December 14, 2006, IST terminated Glynn,

**2.** Glynn misnames the Office of the Inspector General, calling it the "Office of Investigator General." (Third Am. Compl. ¶ 4.)

**3.** Glynn does not state who told him not to go into the Assembly area or give work to the assemblers, but presumably it was a supervisor at IST.

informing him that the discharge was "for the good of the company." (*Id.* ¶¶ 90–91.)

## II.

■ Glynn has filed motions for leave to file second and third amended complaints. Defendants strenuously oppose these motions, arguing that the proposed amendments are prejudicial, dilatory, in bad faith, and futile. Defendants' arguments are overwrought and unavailing. Glynn's initial complaint was filed on June 21, 2007, and an amended complaint was filed, as of right, on September 21, 2007. On October 23, 2007 and November 12, 2007, plaintiff filed the pending motions for leave to file second and third amended complaints.

■ Although it certainly would have been more efficient if Glynn had filed all the amendments in a single amended complaint, such slight inefficiencies are no reason to prevent him from pleading his case as he sees fit. Some of plaintiff's proposed amendments are attributable to highly technical objections lodged in defendants' pending motion to dismiss.[4] Pleading is not a "game of skill," *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), and courts "should freely give leave [to amend] when justice so requires," Fed. R.Civ.P. 15(a)(2). In light of the liberal amendment standards, and the largely technical nature of the proposed amend-

ments, I find that Glynn's amendments are not prejudicial, dilatory, in bad faith, or futile. Accordingly, the motions for leave to file second and third amended complaints are granted.[5]

## III.

■ In response to defendants' motion to dismiss for lack of personal jurisdiction over defendants Caprario and Puzzo, *see infra* § IV(A), Glynn has filed a motion for preliminary discovery on the question of jurisdiction and a related motion to stay this Court's determination of that question. (*See* Pl.'s Mot. for Prelim. Disc. on Personal Jurisdiction and to Stay Decision of Defs.' Mot. to Dismiss.) While discovery is "broad in scope and freely permitted," a court can deny jurisdictional discovery when "plaintiff offers only speculation or conclusory assertions about contacts with a forum state." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.,* 334 F.3d 390, 402 (4th Cir.2003).

Here, Glynn proffers only that defendants Caprario and Puzzo may have made phone calls or sent emails to Maryland, have perhaps visited the state several times, and owned stock in IST during the relevant period. (*See* Pl.'s Mem. in Supp. of Mot. for Prelim. Disc. on Personal Jurisdiction and to Stay Decision of Defs.' Mot. to Dismiss at 1–3.) Such limited

4. For example, defendants seek dismissal of Glynn's state law claims on the ground that Glynn cannot recover on *both* New Hampshire and Maryland causes of action. This is obviously true, but it was also obvious to the Court that Counts II and III of the initial complaint (alleging causes of action under Maryland and New Hampshire law respectively) were pled in the alternative. When defendants sought dismissal of these state law claims, plaintiff amended his complaint to clarify that which should have already been clear—namely, that the two state law claims were pled in the alternative.

5. Because Glynn drafted his opposition to defendants' motion to dismiss on the assumption that this Court would grant his motions for leave to file amended complaints, he has also filed a motion for leave to supplement his opposition if the motions for leave to file amended complaints are denied. Because the motions for leave to file amended complaints are granted, Glynn's motion for leave to supplement his opposition is dismissed as moot.

contacts are clearly insufficient for this Court to exercise personal jurisdiction when the lawsuit does not arise out of those contacts, *see infra* § IV(A), and any other claims are purely speculative. *See Hill v. Brush Engineered Materials, Inc.*, 383 F.Supp.2d 814, 819 (D.Md.2005) (denying jurisdictional discovery when plaintiff "failed to proffer any further facts that, if proven, would affect this Court's exercise of jurisdiction"); *Quinn v. Bowmar Publ'g Co.*, 445 F.Supp. 780, 787 (D.Md.1978) (declining to postpone decision on the personal jurisdiction question until after discovery). This conclusion is bolstered by defendants' affidavits, which highlight their extremely limited contacts with Maryland. (*See* Caprario Aff.; Puzzo Aff.) Accordingly, Glynn's motion is denied. *See McLaughlin v. McPhail*, 707 F.2d 800, 806–07 (4th Cir.1983) (affirming district court's decision to deny plaintiff's motion to depose defendants on jurisdictional question).

### IV.

Defendants move under Federal Rule of Civil Procedure 12(b)(2) to have all counts dismissed against defendants EDO, Caprario, and Puzzo for lack of personal jurisdiction.[6] (Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 4–18.) In support of this motion, defendants present several affidavits attesting to their limited contacts with Maryland. (*See* Smith Aff.; Caprario Aff.; Puzzo Aff.) Glynn counters by proffering several connections between Maryland and the defendants and by arguing that this Court has both general and specific jurisdiction over each of the defendants. (Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 3–21.) Because I make this jurisdictional determination on the basis of the pleadings and affidavits alone, Glynn must only make a *prima facie* showing of

personal jurisdiction to proceed. *See, e.g., Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir.1993).

■ This Court can exercise personal jurisdiction when: "(1) the exercise of jurisdiction [is] authorized under the state's long-arm statute; and (2) the exercise of jurisdiction ... comport[s] with the due process requirements of the Fourteenth Amendment." *Carefirst of Md., Inc.*, 334 F.3d at 396. The Maryland long-arm statute was intended to reach to the outer limits of due process. *See, e.g., Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC*, 388 Md. 1, 878 A.2d 567, 576 (2005). Accordingly, the two-part inquiry merges and any limitations on this Court's jurisdiction must be found in the Fourteenth Amendment. As to the individual defendants Caprario and Puzzo, I find that this Court has no jurisdiction. As to EDO, I find that this Court does have jurisdiction.

### A.

Defendants Caprario and Puzzo are employees of IST who were allegedly instrumental in the retaliation underlying this litigation. In support of exercising jurisdiction over these individual defendants, Glynn proffers the following facts:

(1) Caprario and Puzzo are employees of IST, which has offices in Maryland;

(2) Caprario and Puzzo owned stock in IST;

(3) Caprario and Puzzo profited financially when EDO purchased IST;

(4) Caprario and Puzzo made and received phone calls to IST stockholders in Maryland;

(5) Caprario and Puzzo exchanged emails with IST stockholders in Maryland;

---

**6.** Defendants apparently concede that this Court has jurisdiction over IST.

(6) Caprario has visited Maryland in the past;

(7) Puzzo has visited Maryland in the past and once visited IST's offices in Maryland.

(Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 9.) Even accepting these facts as true, they are inadequate to sustain jurisdiction.[7]

The seminal case of *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), is instructive here. In *Shaffer*, the Supreme Court rejected the *in rem* jurisdictional doctrine of *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1877), in favor of the personal jurisdiction framework enshrined in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In doing so, the Court held that a Delaware court had no jurisdiction over individual defendants who owned stock in a Delaware corporation but otherwise had no ties with the state even though the stock was considered legally present in Delaware. *Shaffer*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683. While the presence of a defendant's property in the State "may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation," the mere ownership of property in the forum state was not dispositive of the jurisdictional question. *Id.* at 207, 97 S.Ct. 2569.

The *Shaffer* defendants' ownership of stock in a Delaware corporation was insufficient to provide for jurisdiction when the stock was "not the subject matter of [the] litigation" or related to the "underlying cause of action." *Id.* at 213, 97 S.Ct. 2569 ("The Delaware courts based their assertion of jurisdiction in this case solely on the statutory presence of appellants' property in Delaware. Yet that property is not the subject matter of this litigation, nor is the underlying cause of action related to the property."). In the instant case, Glynn repeatedly emphasizes that Caprario and Puzzo held stock in IST, and profited financially from the sale of that stock to EDO. Yet the sale of IST is unrelated to the events underlying this case; consequently, contacts with Maryland related to that sale do not create a basis for the exercise of specific jurisdiction over Glynn's whistleblower case.[8] Thus even if Caprario and Puzzo's stock ownership would be sufficient to support jurisdiction

---

7. Defendants provide affidavits disputing several of these facts. In particular, Puzzo avers that he made or received only one phone call to or from IST's Maryland offices during the relevant period, and sent or received only nine emails to IST's Maryland offices during the same. (Puzzo Second Aff. ¶ 3.) Additionally, Puzzo claims that the phone call, emails, and one visit to IST's Maryland offices are unrelated to the events underlying this lawsuit. (*Id.* ¶¶ 3, 4.) Caprario states that he made or received only one phone call to or from IST's Maryland offices during the relevant period, and sent or received no e-mails to the same. (Caprario Second Aff. ¶ 3.) Additionally, Caprario claims that the one phone call was unrelated to the events underlying this lawsuit. (*Id.*) Because these allegations are supported by affidavits from persons with knowledge, I would, if necessary, accept them as true for the purposes of this jurisdictional determination. However, because I find there is no personal jurisdiction over Caprario and *Puzzo* even if plaintiff's allegations go unchallenged, I need not rely on the particulars of these affidavits.

8. Cases like *Calder v. Jones*, 465 U.S. 783, 789, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), in which out-of-state defendants committed tortious acts "expressly aimed at" the forum state, are inapposite here because there is no allegation that Caprario and Puzzo's retaliatory acts were in any way "aimed at" Maryland. Indeed, Glynn himself is a New Hampshire resident with little or no connection to Maryland, and not a single event at issue in this case occurred in Maryland. Any alleged bad acts by Caprario and Puzzo were directed, if to anywhere, to New Hampshire.

over a lawsuit about the sale of IST to EDO, it does not give rise to jurisdiction over this employment retaliation case. *See Shaffer*, 433 U.S. at 216, 97 S.Ct. 2569 (noting that it "strains reason ... to suggest that anyone buying securities in a corporation formed in Delaware impliedly consents to subject himself to Delaware's ... jurisdiction on any cause of action") (internal citations omitted); *Harte–Hanks Direct Mkt. v. Varilease Tech.*, 299 F.Supp.2d 505, 513 (D.Md.2004) ("Likewise, jurisdiction over a shareholder of a corporation cannot be predicated on jurisdiction over the corporation.").

For this Court to exercise specific jurisdiction, Glynn's claim must be "related to or arise[ ] out of" the defendants' contacts with Maryland. *Harte–Hanks Direct Mkt.*, 299 F.Supp.2d at 512. The contacts listed above are simply unrelated to this case, and thus there is no specific jurisdiction. Additionally, for the reasons outlined below, the extremely limited contacts between Maryland and the individual defendants fall far short of what is needed for an exercise of general jurisdiction.

Glynn cites *Pittsburgh Terminal Corp. v. Mid Allegheny Corp.*, 831 F.2d 522 (4th Cir.1987), in support of his argument that this Court has jurisdiction over the individual defendants. (Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 7.) In *Pittsburgh Terminal*, two directors of a West Virginia corporation were sued in West Virginia and sought dismissal of the suit on the basis of personal jurisdiction. *Id.* at 524. Although there was no allegation that the defendants had ever been physically present in West Virginia, the Fourth Circuit found that West Virginia did have jurisdiction in light of the defendants' status as directors of an in-state corporation. *Pitts-*

*burgh Terminal Corp.*, 831 F.2d at 526 (arguing that *Shaffer* indicates that "the acceptance and exercise of a *directorship* in a domestic corporation" may be constitutionally sufficient to give rise to personal jurisdiction) (emphasis added).

■ Here, there is no allegation that Caprario or Puzzo are directors of IST; to the contrary, Caprario and Puzzo are mere employees. Employment is insufficient to give rise to personal jurisdiction, and a corporation's contacts with a forum state cannot be attributed to its employees. In short, simply because Caprario and Puzzo worked for IST does not make them subject to jurisdiction wherever IST might be sued.[9] *See, e.g., Harte–Hanks Direct Mkt.*, 299 F.Supp.2d at 513 ("Personal jurisdiction over an individual officer, director, or employee of a corporation does not automatically flow from personal jurisdiction over the corporation."); *Birrane v. Master Collectors, Inc.*, 738 F.Supp. 167, 169 (D.Md.1990) (finding "no basis whatsoever for holding that merely because a corporation transacts business in the state ... or has other substantial contacts with the state, an individual who is its principal should be deemed to have engaged in those activities personally"); *Bowmar Publ'g Co.*, 445 F.Supp. at 785 (stating that a court cannot obtain jurisdiction over individual officers or employees based "upon jurisdiction over the corporation").

■ *Pittsburgh Terminal* thus establishes the exception rather than the rule: while directors of corporations may be subject to suit in the corporation's home state when such directors have the "affairs of [the] corporation entrusted to them," mere employees or stockholders are not subject to jurisdiction solely on the basis of

---

9. This reflects the law's recognition that individuals and corporations are distinct legal entities. Absent grounds to pierce the corpo-rate veil, which do not exist here, a corporation's contacts with a State will not give rise to personal jurisdiction over an employee.

employment or stock ownership. *Pittsburgh Terminal Corp.*, 831 F.2d at 527. Moreover, the fact that Caprario and Puzzo may have placed several phone calls or sent several e-mails to Maryland is of little consequence because those calls were unrelated to the events underlying this litigation. *Compare Harte–Hanks Direct Mkt.*, 299 F.Supp.2d at 513 n. 5 ("Phone calls or correspondence to Maryland from out-of-state generally are not sufficient, standing alone, to confer personal jurisdiction.") *with McLaughlin v. Copeland*, 435 F.Supp. 513 (D.Md.1977) (finding that letters and telephone calls into Maryland are relevant for jurisdictional purposes when those letters and calls involve the events underlying the litigation). The standard for the exercise of general jurisdiction is quite high and such occasional, limited contacts are clearly insufficient—even when taken in conjunction with the other contacts—to suffice.[10]

Ultimately, Caprario and Puzzo simply have "nothing to do with the [forum state]." *Shaffer*, 433 U.S. at 216, 97 S.Ct. 2569. Thus, because the limited contacts with Maryland are unrelated to the events underlying this litigation, because the defendants are not directors of IST, and because there are inadequate contacts for the exercise of general jurisdiction, the motion to dismiss all claims against Caprario and Puzzo is granted.[11]

**B.**

**(1)**

Defendant EDO, a New York corporation with its principal place of business in New York, is the parent company of defendant IST. Glynn argues that this Court has general and specific jurisdiction over EDO.[12] In support of his argument, Glynn proffers the following facts:

(1) EDO derives some revenue from sales and operations in Maryland;

(2) EDO recruits from Maryland institutions of higher education;

(3) EDO currently has one employee and several online job listings in Maryland;

(4) EDO owns real property or leases thereof in Maryland;

---

10. Similarly unpersuasive is the fact that Caprario and Puzzo have visited the state of Maryland at some point in their lives. *See Bowmar Publ'g Co.*, 445 F.Supp. at 786 (holding that a one-week trip to Maryland nine years in the past is insufficient for an exercise of general jurisdiction).

11. Defendants have also moved to dismiss the False Claims Act claim and the New Hampshire state law claim against Caprario and *Puzzo* on the basis that those causes of action do not impose liability on individual defendants. Because I dismiss all counts against Caprario and Puzzo on jurisdictional grounds, I need not reach these questions. However, it does appear that defendants are correct, and the False Claims Act and the New Hampshire claim would be dismissed with respect to Caprario and Puzzo on this basis as well.

12. Glynn invokes three sections of the Maryland long-arm statute as the basis for exercising personal jurisdiction over EDO. (*See* Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 8.) Those sections, Md.Code §§ 6–103(b)(1), 6–103(b)(4), and 6–103(b)(5), provide respectively that a defendant will be subject to a Maryland court's jurisdiction when it "[t]ransacts any business or performs any character of work or service in the State," when it "regularly does or solicits business, engages in any other persistent course of conduct in the State, or derives substantial revenue from ... the State," and when it "has an interest in, uses, or possesses real property in the State." Because the Maryland long-arm statute reaches to the outer limits of due process, *see Realtime Gaming Holding Co., LLC*, 878 A.2d at 576, I will focus my analysis on whether the totality of EDO's contacts are sufficient for a constitutional exercise of jurisdiction.

(5) IST, an EDO subsidiary, has substantial contacts in Maryland.

The facts concerning EDO's contacts with Maryland are largely undisputed. For example, the affidavit of Sean Smith, associate counsel of EDO, states that EDO has no offices in Maryland, currently has one employee in Maryland, made approximately 1.3% of its annual sales in Maryland last year, and acknowledges that EDO recruits from two Maryland institutions of higher education. (Smith Aff. ¶¶ 6, 9, 10, 11.)

■ As an initial matter, Glynn's brief argument that this Court has specific jurisdiction over EDO fails for the reasons discussed above with respect to the individual defendants. *See supra* § IV(A). In short, EDO's acquisition of IST is unrelated to the acts constituting alleged violations of the False Claims Act and state wrongful discharge laws. The events forming the gravamen of this lawsuit occurred in New Hampshire; accordingly, a Maryland court cannot exercise specific jurisdiction over any defendant in this action.[13]

■ Leaving aside the argument that this Court should impute IST's contacts to EDO, which is addressed *infra* § IV(B)(2), the contacts between EDO and Maryland are insufficient for general jurisdiction. First, the fact that EDO recruits at two Maryland institutions of higher education does little to meet the high standard for general jurisdiction, particularly because Glynn's injury has no "rational nexus" with the state.[14] *See Ratliff v. Cooper Labs., Inc.*, 444 F.2d 745, 748 (4th Cir. 1971) ("Significant in the instant factual setting is the lack of a 'rational nexus' between the forum state and the relevant facts surrounding the claims presented.").

■ Second, a single in-state employee and several online job listings are relatively minor contacts that add little to the analysis.[15] *See, e.g., Nichols v. G.D.*

---

**13.** Glynn's reliance on *Blue Ridge Bank v. Veribanc, Inc.*, 755 F.2d 371 (4th Cir.1985), and *First American First, Inc. v. National Association of Bank Women*, 802 F.2d 1511 (4th Cir.1986), is misplaced. *Blue Ridge Bank* is easily distinguished on two grounds: first, the alleged injury to the plaintiff occurred in the forum state when an article was published in that state defaming the in-state plaintiff and, second, the defendant had instructed the author of the defamatory article to include its name and location in the article. *Blue Ridge Bank*, 755 F.2d at 373–74. Accordingly, *Blue Ridge Bank* represents nothing more than a classic case of specific jurisdiction based on an instate injury and relationship between defendant and the occurrence of the injury. In the instant case, any injury occurred in New Hampshire, as did all the acts causing that injury. *First American First* is similarly distinguishable because the libelous letters sent by the defendant in that case were mailed (and read, thus published) *into the forum state. See First Am. First, Inc.*, 802 F.2d at 1512–14. Thus the injury was suffered in the forum state, and the events underlying the libel were connected to the forum state. *Id.* There is no such connection to Maryland here, which is precisely why this Court cannot exercise specific jurisdiction.

**14.** Mere continuity of contacts is insufficient to create general jurisdiction. *See Int'l Shoe Co.*, 326 U.S. at 317, 66 S.Ct. 154. Rather, the "continuous corporate operation within a state" must be "so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Id.* at 318, 66 S.Ct. 154.

**15.** There is a factual question as to whether EDO had any employees in Maryland during the period relevant to this lawsuit and as to whether the job listings are actually for jobs at EDO or at EDO subsidiary companies. While EDO admits to having one Maryland employee at the current time, it avers that it had no such employees at the time the lawsuit was filed, (Smith Aff. ¶ 9), and it is axiomatic that "[w]hether general or specific jurisdiction is sought, a defendant's 'contacts' with a forum state are measured as of the time the claim arose." *Hardnett v. Duquesne Univ.*, 897 F.Supp. 920, 923 (D.Md.1995). Because

*Searle & Co.*, 991 F.2d 1195, 1200 (4th Cir.1993) (finding no general jurisdiction despite the corporation's employment of 17–21 persons in the forum state). Third and finally, EDO's interest in real property in Maryland is more relevant for a specific jurisdiction analysis, and would only give rise to jurisdiction if the events underlying the lawsuit were related to the real property.[16] *Cf. Long v. Baldt*, 464 F.Supp. 269, 273 (D.S.C.1979) (finding jurisdiction in South Carolina when South Carolina property owned by defendant was "involved in the underlying cause of action" and defendants had a variety of other contacts with South Carolina). In conclusion, even all of these facts taken together do not constitute the sort of extensive and systematic contacts necessary for an exercise of general jurisdiction, particularly when the plaintiff himself has no connection to Maryland.[17] *See Nichols*, 991 F.2d at 1200 (observing that "broad construc-

tions of general jurisdiction should be generally disfavored").

(2)

Glynn also argues for jurisdiction by seeking to impute IST's Maryland contacts to EDO. (*See* Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 14–16.) This argument is more compelling. Generally, of course, "the contacts of a corporate subsidiary cannot impute jurisdiction to its parent entity." *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005); *see also United States v. Bestfoods*, 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation ... is not liable for the acts of its subsidiaries.") (internal citations omitted). However, Glynn correctly notes that when a parent corporation exercises sufficient control over the activities of a

---

these disputed facts would not alter my analysis one way or the other, I will not address this issue further.

**16.** While EDO does generates some revenue in Maryland, it does not appear to be substantial enough to justify the exercise of general jurisdiction. (Smith Aff. ¶ 10 ("EDO Corporation's 2006 sales in Maryland amounted to approximately 1.33% of EDO Corporation's sales.").) *See, e.g., Carey v. Fiberfloat Corp.*, 849 F.Supp. 423, 428 (D.Md.1994) (finding no personal jurisdiction over corporation that generated less than ten percent of its revenue from Maryland).

**17.** Glynn's lack of a connection with Maryland, combined with the fact that all of the events relevant to this lawsuit occurred in New Hampshire, is justifiably considered here. For example, in *Ratliff v. Cooper Laboratories, Inc.*, 444 F.2d 745 (4th Cir.1971), plaintiffs brought suit in South Carolina against nonresident defendants despite the fact that plaintiffs themselves had no connection with South Carolina and none of the events giving rise to the lawsuit occurred in South Carolina. The only reason plaintiffs

filed suit in that district was due to the state's uniquely long statute of limitations. *Id.* at 746. In analyzing whether or not South Carolina could exercise personal jurisdiction over the defendants, the Fourth Circuit observed that, "[s]ignificant in the instant factual setting is the lack of a 'rational nexus' between the forum state and the relevant facts surrounding the claims presented." *Id.* at 748. As *Ratliff* and other cases elucidate, the plaintiff's connection to the forum state is relevant to the personal jurisdiction analysis. *See also Nichols*, 991 F.2d at 1199 n. 3 (noting as relevant that "none of the plaintiffs here are Maryland residents and ... Maryland is a less appropriate forum that Illinois, where [defendant] has its principal place of business, or than any other of the states where plaintiffs' cause of action arose"); *Lee v. Walworth Valve Co.*, 482 F.2d 297, 300 (4th Cir.1973) ("Unquestionably, when the plaintiff is a stranger to the forum, we would require more substantial contacts with the forum state by the defendant before proceeding to exercise *in personam* jurisdiction than we would in a case in which the plaintiff lives in the forum state and the cause of action arose out of the defendant's activity in that state ...").

subsidiary, the contacts of the subsidiary can be imputed to the parent. *See Mylan Labs., Inc.*, 2 F.3d at 61 (allowing imputation of contacts for jurisdictional purposes when the parent corporation "exerts considerable control over the activities of the subsidiary").

▮ In determining whether a parent corporation exercises sufficient control to justify imputing the subsidiary's contacts, a variety of factors are considered. Central to the question "is whether significant decisions of the subsidiary must be approved by the parent." *Id.* Glynn's pleadings, which at this point stand unrebutted, do allege that some of IST's decisions must be approved by EDO. (*See* Third Am. Compl. ¶ 116 (IST must submit for approval purchase orders over $1,000); *id.* ¶ 117 (EDO monitors IST's contract fulfillment on a daily basis).)

▮ Other factors look at whether or not there is an independent reason for the subsidiary's existence, and if the parent corporation knew or should have known that its actions would have an impact in the forum state. *Mylan Labs., Inc.*, 2 F.3d at 61. Also important is whether or not the parent and subsidiary keep separate accounting records and procedures, hold separate directors' meetings, and whether the subsidiary is undercapitalized or fraudulently incorporated. *See Newman v. Motorola, Inc.*, 125 F.Supp.2d 717, 723 (D.Md.2000). According to Glynn's pleadings, EDO and IST have the same accounting and financial recording system. (Third Am. Compl. ¶¶ 137–38.)

While there is no evidence concerning whether EDO and IST have separate directors' meetings, the pleadings do allege that EDO and IST have the same board of directors.[18] (*Id.* ¶ 136.) Finally, Glynn's pleadings allege that IST is undercapitalized. (*Id.* ¶¶ 132–35.) In light of these pleadings, which are largely uncontested at this stage, I find that EDO exercises sufficient control over IST to justify imputing IST's contacts to EDO. Thus, this Court can exercise jurisdiction over EDO.

In conclusion, for the simple reason that the events underlying this litigation occurred in New Hampshire and have no identifiable connection to Maryland, this Court cannot exercise specific jurisdiction over either the individual defendants or EDO. However, while the extremely limited contacts of Caprario and Puzzo are insufficient to give rise to general jurisdiction, Glynn has pled sufficient facts for the Court to exercise general jurisdiction over EDO in light of its subsidiary's Maryland contacts.[19] Accordingly, defendants' motion to dismiss all claims against Caprario and Puzzo for lack of personal jurisdiction is granted, and defendants' motion to dismiss claims against EDO is denied.

## V.

▮ Defendants next argue that this Court does not have subject matter jurisdiction over plaintiff's Maryland and New Hampshire state law claims because the False Claims Act ("FCA") preempted such state causes of action. (Defs.' Mem. in

---

**18.** While it is "entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts," the fact that EDO and IST have the same directors may still be a factor in the analysis. *Bestfoods*, 524 U.S. at 69, 118 S.Ct. 1876 (internal citations omitted).

**19.** Of course, if a factual record is developed during this litigation that undermines the conclusion reached here, EDO's motion to dismiss for lack of personal jurisdiction can be renewed.

Support of Mot. to Dismiss at 25–27.) Defendants admit that the relevant cases "do not explicitly hold that [31 U.S.C.] § 3730(h) preempts state law claims" but nevertheless "encourage this Court to follow the natural line of reasoning posited in these cases" and declare all state claims preempted in this area.[20] (*Id.* at 27.) For the reasons outlined below, this argument is without merit and defendants' motion to dismiss the state law claims on this basis is denied.

 Federal law will preempt and displace state law in three circumstances: (1) when Congress enacts a statute that explicitly preempts state law; (2) when Congress regulates in such a pervasive manner that it can be inferred Congress intended to displace state law in the field and; (3) when state law actually conflicts with federal law. *See, e.g., English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Here, there is no argument that Congress explicitly preempted state law when enacting the FCA. Similarly, there is no actual conflict between the FCA's whistleblowing provisions and the state wrongful discharge claims. The focus of the analysis thus rests on whether the legislative and regulatory scheme is sufficiently comprehensive that an intent to displace can be inferred.

 When federal law regulates an area "traditionally occupied" by the states, which includes employment law, there

must be a "clear and manifest" Congressional intent to preempt. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). Here there is little evidence of such an intent. It is true that the state wrongful discharge claims provide remedies separate and distinct from federal ones, but such overlap is a commonplace occurrence in our federal system. Standing alone, complementary remedies do not give rise to an inference of Congressional intent to preempt. Because I "see no basis for [the] contention that all state-law claims arising from conduct covered by the [statute] are necessarily [preempted]," defendants' motion to dismiss on preemption grounds is denied.[21] *English*, 496 U.S. at 78–79, 110 S.Ct. 2270 (finding no preemption of state intentional infliction of emotional distress claim based upon employment with nuclear plant despite extensive federal regulation of nuclear industry); *see also Pallandino ex rel. United States v. VNA of S. N.J.*, 68 F.Supp.2d 455, 465–69 (D.N.J.1999) (finding that the FCA does not preempt state whistleblower claims and noting that "state law is not preempted if it simply furthers the objective of the federal law or imposes stricter standards").

## VI.

 Defendants move to dismiss Glynn's FCA retaliation claim, arguing that he has failed to state a claim under 31 U.S.C. § 3730(h). (*See* Defs.' Mem. at 20–

---

**20.** Defendants also cite a treatise which states that "Congress *could be interpreted* as having intended to ... preempt[]." (Defs.' Mem. in Support of Mot. to Dismiss at 27 (citing Jack T. Boese, Civil False Claims and Qui Tam Actions § 4.11[C] (3d ed.2005)) (emphasis added).)

**21.** Cases relied upon by defendants are inapposite. For example, in *Adler v. Continental Insurance Co.*, 1998 WL 10232, at *1 (10th Cir.1998), the Tenth Circuit merely noted that

the district court had "expressly declined to address whether [the plaintiff's] state law retaliation claim was precluded by an adequate remedy under the False Claims Act." This in no way supports the notion that the False Claims Act preempts state wrongful discharge claims. Similarly, *Zahodnick v. International Business Machines Corporation*, 135 F.3d 911, 914 (4th Cir.1997), did not deal with federal preemption but, rather, the outer limits of the state cause of action.

25.) The FCA is a federal statute authorizing private individuals as well as the government to bring suit against federal contractors allegedly defrauding the government. *See* 31 U.S.C. § 3730 *et seq.* The FCA's retaliation provisions protect whistleblowing employees of such contractors from being retaliated against as a result of their participation in a FCA investigation or lawsuit. *See id.* § 3730(h). The three elements of a FCA retaliation claim are: (1) that the employee "took acts in furtherance of a *qui tam* suit; (2) [that the] employer knew of these acts; and (3) [that the] employer discharged [the employee] as a result of these acts." *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 914 (4th Cir.1997). Defendants assert that Glynn does not plead that he took acts in furtherance of a *qui tam* suit or that his termination was a result of those acts. Defendants also argue that EDO is not a proper defendant for this count as it was not Glynn's "employer" as the FCA defines that term. I examine each of these contentions in turn.

**A.**

The gravamen of Glynn's FCA claim is that he reported to his supervisors and then to government investigators that IST provided a number of flawed devices to the military. The central question here is whether such acts constitute protected activity. The FCA's whistleblower provisions do not require that a *qui tam* suit actually be filed; investigatory activities are protected by the statute. *See, e.g., Eberhardt v. Integrated Design & Const., Inc.*, 167 F.3d 861, 867 (4th Cir.1999) (finding that "investigatory actions" can rise "to the level of protected activity" regardless of whether or not a *qui tam* action is ever filed); *Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir.1994) ("The statute expressly covers investigatory activities preceding litigation. What [the plaintiff]

did, supplying information that set off an investigation, fits comfortably into this category.").

However, not all investigations of internal corporate practices are protected. For an investigation to be protected, it "must concern 'false or fraudulent' claims." *Eberhardt*, 167 F.3d at 868 (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C.Cir. 1998)). In particular, "an employee's protected activity must involve 'investigatory matters that reasonably could lead to a viable False Claims Act case.'" *United States ex rel. Brooks v. Lockheed Martin Corp.*, 423 F.Supp.2d 522, 530 (D.Md.2006) (quoting *United States ex rel. Yesudian*, 153 F.3d at 740).

Defendants contend that Glynn merely engaged in a non-protected internal investigation of IST's failure to fulfill contractual requirements. In particular, defendants rely on *United States ex rel. Brooks v. Lockheed Martin Corp.*, 423 F.Supp.2d 522. In *Brooks*, an employee reported to a government agent that his employer was failing to perform quality assurance audits that were required by the government contract. *Id.* at 530. The court found that this reporting was not protected by the FCA because the employee reported "at most, the non-performance of a contractual duty by [the plaintiff's] employer." *Id.* Defendants argue that *Brooks* shows that Glynn's investigation and report to the DOD was not protected by the FCA.

Defendants also rely on *Zahodnick v. International Business Machines Corp.*, 135 F.3d 911. In *Zahodnick*, the plaintiff "merely informed a supervisor of the [mischarging] problem and sought confirmation that a correction was being made . . ." *Id.* at 914. The Fourth Circuit found that such actions were not protected by

the FCA. *Id.* However, Glynn's actions far exceed those of the plaintiffs in *Brooks* and *Zahodnick.* To begin with, Glynn reported that his company had provided dysfunctional equipment to the United States Armed Forces, not that his company had simply failed to perform audits of the equipment. Such reporting is even more significant in light of the potential harm that could befall members of the Armed Forces if the IED-countermeasure systems were to fail. Moreover, Glynn not only complained to his supervisors but also contacted government agents and reported his suspicions of fraud to those agents. These facts are more than sufficient to distinguish the instant case from *Brooks* and *Zahodnick.*

Finally, defendants rely on *United States ex rel. Karvelas v. Melrose–Wakefield Hospital,* 360 F.3d 220 (1st Cir.2004). In *Karvelas,* the First Circuit found that an employee's investigation of "regulatory failures" was insufficient to be considered acts in furtherance of a *qui tam* suit. *Id.* at 237. In so finding, the court emphasized that a protected act must revolve around the "submission of false or fraudulent claims for payment to the government." This case entirely supports the proposition that the activities engaged in by Glynn are protected by the FCA because Glynn alleges he investigated and reported not mere regulatory failures but rather his company's provision of malfunctioning military equipment to the government.

In sum, defendants' characterization of Glynn's actions is wide of the mark. Defendants appear to believe that because Glynn did not know the details of IST's contract with the DOD, he could not engage in protected activity. They also attempt to portray his concerns as technical contractual ones, rather than ones over the submission of false or fraudulent claims.

Both of these arguments are unpersuasive. In fact, the actions engaged in by Glynn are precisely the sort of investigatory acts that the FCA was designed to protect.

Glynn identified a problem with a product that his company was supplying to the United States military. He alerted his supervisors to the problem, ensured that it was fixed, and became troubled over his company's refusal to inform the government of the flaws in the previously-shipped products. He pursued his concerns internally, and was allegedly stonewalled. At this point, worried that his company had provided the military with dysfunctional equipment and submitted claims for payment reflecting the price of functional equipment, Glynn contacted government agents, told his story, and triggered an investigation. Defendants contend that these actions are unprotected by the FCA, as they demonstrate only a concern for failure to fulfill contractual requirements.

Many frauds can be repackaged by their perpetrators as mere breaches of contract. Imagine, for example, a company that contracts with the government to provide gold bars at a cost of $50 an ounce. That company tenders bars made of cheap alloy metal and submits an invoice for the full contract price. Under such circumstances, has a fraud been perpetrated and a false claim submitted, and is investigation of those actions thus protected by the FCA? Or are the actions a mere failure to fulfill a contract requirement, and any investigation completely unprotected by federal law?

These questions require an exercise in line-drawing. Surely, mere technical matters, such as the failure to perform quality audits in *Brooks* can be regarded as non-protected contractual requirements. However, to vindicate Congressional intent and aid the government in the discovery of false claims, more substantive failures

must be termed protected investigation of fraud. Here, Glynn's investigation and reporting of his findings to government agents is clearly protected activity. Defendants emphasize that Glynn never saw the government contracts, and thus never knew if false claims were being submitted. But this argument is a paper tiger, as it is clear that "there is no requirement that to be protected, a plaintiff must have gathered all of the evidence by the time of the retaliation." *U.S. ex rel. Yesudian,* 153 F.3d at 740. Otherwise, a company could simply shield itself from the FCA's retaliation provisions by keeping its employees in the dark about contractual specifications.

The purpose of the FCA's retaliation provisions was to "assure those who may be considering exposing fraud that they are legally protected from retaliatory acts." S.Rep. No. 99–345, at 34, *reprinted in* 1986 U.S.C.C.A.N. at 5229. What Glynn allegedly did certainly counts as "considering exposing fraud," at least in light of the information he had at the time. Ultimately, the FCA "expressly covers investigatory activities preceding litigation. What [the plaintiff] did, supplying information that set off an investigation, fits comfortably into this category." *Neal,* 33 F.3d at 864. Accordingly, defendants' motion to dismiss the FCA claim on this basis is denied.

### B.

■■■■ Defendants next argue that Glynn fails to plead facts sufficient to state a claim with respect to causation. Glynn's complaint is more than adequate in this area. Obviously a plaintiff need not *prove* all elements of his claim in the complaint. *See, e.g., Chao v. Rivendell Woods, Inc.,* 415 F.3d 342, 349 (4th Cir.2005) ("We reemphasize that a complaint need not 'make a case' against a defendant or 'forecast evidence sufficient to prove an element' of

the claim.") (citing *Iodice v. United States,* 289 F.3d 270, 281 (4th Cir.2002)) (alterations omitted). Here, the temporal proximity between plaintiff's protected conduct and the adverse employment acts, including his ultimate discharge, is more than enough to plead causation. However, Glynn has pled additional facts that make a causal inference even more supportable; in particular, he alleges that after he reported his concerns to the DOD, Caprario stated that Glynn had "drawn a line in the sand" and would be responsible for the consequences. (Third Am. Compl. ¶ 88.) Such allegations clearly raise an inference that Glynn's discharge was a result of his protected activity.

### C.

■■■■ Defendants next argue that Glynn's FCA claims against EDO should be dismissed because Congress did not intend to impose liability on parent companies. (Defs.' Mem. at 23–25.) In particular, defendants contend that the term "employer" does not include parent companies. The analysis here largely tracks the discussion of whether IST's jurisdictional contacts with Maryland can be imputed to EDO. *See supra,* § IV(B). At this stage of the litigation, Glynn has pled sufficient facts for this Court to look past the separate corporate identities of IST and EDO. Thus for the reasons discussed above, *see supra* § IV(B), as well as the fact that EDO offered Glynn an employee *retention* agreement (indicating that EDO already considered Glynn an employee), I deny defendants' motion to dismiss the FCA claim against EDO on this ground.

### VII.

■■■■ Defendants assert that Glynn has failed to state a claim upon which relief can be granted with respect to the state wrongful discharge claims, arguing that he

has failed to plead the elements of both the New Hampshire and Maryland common law torts.[22] (Defs.' Mem. at 25–36.) I will first examine the argument concerning the New Hampshire claim.

 "To support a claim of wrongful termination under [New Hampshire] law, a plaintiff must establish two elements: one, that the employer terminated the employment out of bad faith, malice, or retaliation; and two, that the employer terminated the employment because the employee performed acts which public policy would encourage or because he refused to perform acts which public policy would condemn." *Short v. Sch. Admin. Unit No. 16,* 136 N.H. 76, 612 A.2d 364, 370 (1992). Defendants argue that the New Hampshire wrongful discharge claim should be dismissed because such a claim is available only to at-will employees, and Glynn is a contract employee. (Defs.' Mem. at 33.) It is true that New Hampshire's wrongful discharge tort is not available to contract employees. *See, e.g., Jordan v. Verizon New England, Inc.,* 2005 WL 1568860, at *4 n. 2 (D.N.H., July 5, 2005). However, Glynn claims that he was an at will employee and defendants have put forth no evidence that he was actually a contract employee. The retention agreement that EDO offered Glynn is of no relevance here because Glynn did not sign the agreement and thus had no contractual relationship with EDO. (Third Am. Compl. ¶ 113.)

 Defendants next argue that EDO is not a proper defendant because it is not his "employer" under New Hampshire law. Here, the analysis is the same as with personal jurisdiction and the FCA's definition of "employer": Glynn has pled suffi-

cient facts for this Court to consider IST and EDO one entity. Accordingly, defendants' motion to dismiss on this basis is denied.

 Defendants finally argue that the New Hampshire wrongful discharge claim is unavailable where, as here, another statute provides a private right of action to vindicate the public policy in question. Although this is a close question, I believe that New Hampshire does not preclude a common law wrongful discharge claim simply because a federal statute provides a private right of action.

In support of their argument that the wrongful discharge tort is unavailable, defendants point to *Smith v. F.W. Morse & Co., Inc.,* 76 F.3d 413 (1st Cir.1996). In *Smith,* the plaintiff pursued a wrongful discharge claim in conjunction with her Title VII gender discrimination claim. *Id.* at 419. The First Circuit upheld the district court's grant of summary judgment on the wrongful discharge claim, finding that New Hampshire does not provide a cause of action for wrongful discharge when "the public policy at stake"—gender discrimination in *Smith*—"is codified in a statute that itself provides a private right of action to remedy transgressions." *Id.* at 428–29. In *Smith,* gender discrimination was protected by Title VII, so the New Hampshire wrongful discharge claim was unavailable. Here, the FCA provides a private right of action that holds employers liable for retaliation against whistleblowers. Thus, *Smith* would dictate that I dismiss the New Hampshire claim because "the existence of a [statutory private right of action] precludes the [plaintiff] . . . from

22. Defendants also argue that this Court should decline to exercise supplemental jurisdiction over the state law claims, contending that the state law claims predominate over the federal claims, *see* 28 U.S.C. § 1367(c)(2),

and that other "compelling reasons" exist for declining jurisdiction, 28 U.S.C. § 1367(c)(4). These arguments are without merit, and the motion to dismiss on this basis is denied.

asserting a common law claim for wrongful discharge." *Id.* at 429.

However, *Smith*, in which a federal court was interpreting state law, may no longer be good law. In particular, two recent New Hampshire state cases draw *Smith* into question. First, in *Bliss v. Stow Mills, Inc.*, 146 N.H. 550, 786 A.2d 815 (2001), the Supreme Court of New Hampshire reversed the trial court's dismissal of plaintiff's common law wrongful discharge claim, finding that the federal Surface Transportation and Assistance Act of 1982 ("STAA") did not preempt state law remedies. Although the *Stow Mills* court did not discuss this precise issue in detail, it clearly contemplated that despite the availability of a federal private right of action, a wrongful discharge claim was still available under New Hampshire law. *See id.* at 820 ("We briefly turn to the defendant's argument that where a statutory remedy exists, no common law cause of action can lie. . . . The defendant asserts that the plaintiff has a remedy under [the STAA] and, therefore, no common law claim for wrongful discharge can lie. Here, our preemption analysis includes a detailed examination of the express and implied intent of Congress and we find it unnecessary to revisit the same issue under the common law rule . . . .").

A similar result was reached in *Karch v. BayBank FSB*, 147 N.H. 525, 794 A.2d 763 (2002), where a common law wrongful discharge claim was upheld by the New Hampshire Supreme Court even though the state statute which supplied the public policy underlying the claim contained its own remedial scheme. These two cases represent an understanding by the New Hampshire courts—which are, of course, the authorities on New Hampshire law—that a plaintiff can pursue a common law wrongful discharge claim even when another civil remedy is available. *Stow Mills* is particularly instructive, as it demonstrates that the existence of a federal statutory right of action—under the STAA in *Stow Mills* and the FCA in the instant case—does not render New Hampshire's common law wrongful discharge tort unavailable.

Finally, in *Slater v. Verizon Communications, Inc.*, 2005 WL 488676, at *3 (D.N.H., March 3, 2005), a district court held that the existence of a statutory remedy did not require the dismissal of a New Hampshire wrongful discharge claim. The *Slater* court acknowledged that while New Hampshire courts have held that "a plaintiff may not pursue a common law remedy where the legislature intended to replace it with a statutory cause of action," it does not necessarily follow that all statutes intend to displace all common law remedies. *Id.* (citing *Wenners v. Great State Beverages, Inc.*, 140 N.H. 100, 663 A.2d 623, 625 (1995)). Indeed, *Slater* cited *Stow Mills* and *Karch* as two cases in which "plaintiffs have been allowed to pursue common law wrongful discharge claims in which the public policy element has been supplied by statutes that *also provided specific remedies.*" *Id.* (emphasis added). In light of these cases and their arguable rejection of the First Circuit's holding in *Smith*, I find that Glynn can proceed with his New Hampshire wrongful discharge claim despite the availability of a private right of action under the FCA.[23]

---

**23.** Nothing in *Murdy v. Nashua School District*, 2006 WL 3730092 (D.N.H., Dec.19, 2006), requires a different result. *Murdy* can simply be read as standing for the proposition that if the New Hampshire legislature passes a statute that provides a private right of action, that statute can supplant the common law wrongful discharge claim. *Id.* at *3 (finding that the New Hampshire Law Against Discrimination and the Age Discrimination in Employment Act "codify the public policy against age-based discrimination, create pri-

## VIII.

 In order to establish a claim for wrongful discharge under Maryland law, a plaintiff must show that: "the employee [was] discharged, the basis for the employee's discharge [violated] some clear mandate of public policy, and there [is] a nexus between the employee's conduct and the employer's decision to fire the employee." *Wholey v. Sears Roebuck,* 370 Md. 38, 803 A.2d 482, 489 (2002). Defendants primary argument for the dismissal of this claim is that the Maryland tort is unavailable when the statute relied upon as the source of public policy provides its own remedial scheme for vindication of that policy.[24] (Defs.' Mem. at 32.) This is undoubtedly an accurate statement of the law, *see Makovi v. Sherwin–Williams Co.,* 316 Md. 603, 561 A.2d 179, 190 (1989), and reflects that the "generally accepted *purpose* behind recognizing the tort" of wrongful discharge was "to provide a remedy for an otherwise unremedied violation of public policy." *Wholey,* 803 A.2d at 490 (emphasis in original). In this case, defendants argue that the FCA represents the public policy interest and provides a statutory remedial scheme to vindicate that interest.

Glynn counters by arguing that he is relying on 18 U.S.C. § 1513(e) and 10 U.S.C. § 2409, and not the FCA, as the public policy sources that his wrongful discharge suit seeks to vindicate. 18 U.S.C. § 1513(e) makes it a criminal offense for anyone to, "with the intent to retaliate, take[ ] any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense ..." 18 U.S.C. § 1513(e). 10 U.S.C. § 2409 prohibits government contractors from retaliating against their employees for reporting contract violations to the government.

In support of his position, Glynn points to cases holding that when there are "multiple sources of public policy and ... at least one public policy mandate violated by

---

vate rights of action to remedy violations of that policy, and establish mature procedures for pursuing such an action" and thus the New Hampshire legislature intended to "supplant" the common law wrongful discharge claim). As discussed above, the FCA was not intended to preempt state law remedies, *see supra* § IV, and the defendants point to no New Hampshire statute that could be interpreted as supplanting the common law tort.

**24.** Defendants make a variety of other arguments in support of their motion to dismiss the Maryland wrongful discharge claim, but the other arguments are without merit. First, Defendants incorrectly argue that plaintiffs cannot rely upon federal statutes as the public policy source for the wrongful discharge claim. However, a variety of cases applying Maryland law have approved of reliance upon federal statutes. *See, e.g., King v. Marriott Int'l Inc.,* 160 Md.App. 689, 866 A.2d 895, 902 n. 8 (2004) ("Public policy mandates supporting wrongful discharge have been found in both Maryland and federal statutes, regulations, and to the extent consistent, the common law."); *Adler v. Am. Standard Corp.,* 538 F.Supp. 572, 578 (D.Md.1982) ("Next, there is no merit to defendant's arguments that plaintiff may not rely on federal law as the source of the public policy contravened by plaintiff's discharge."). Defendants next argue that Glynn has not pled that he was "discharged for refusing to violate the law" or "for attempting to exercise a specific legal duty or right," as Maryland law requires. *Terry v. Legato Sys., Inc.,* 241 F.Supp.2d 566, 570 (D.Md.2003). However, Glynn clearly had a legal right to report to government investigators that he believed his employer was defrauding the DOD; that right is precisely what the FCA's retaliation provisions outline and protect. Defendants' third argument is that Glynn fails to plead a sufficient nexus between the defendants and the discharge decision. (Defs.' Mem. at 31.) This argument also fails; for the reasons outlined above, IST's actions can be attributed to EDO.

the [plaintiff's] discharge does not arise from a law that provides its own remedy for the violation, an action for abusive discharge based on *that* violation may lie." *Insignia v. Ashton,* 359 Md. 560, 755 A.2d 1080, 1081 (2000) (describing the holding of *Watson v. Peoples Sec. Life Ins. Co.,* 322 Md. 467, 588 A.2d 760 (1991)) (emphasis in original). These cases affirm the notion that the existence of a civil remedy vindicating one public policy does not preclude application of the wrongful discharge tort when another public policy was violated by the discharge and is not protected by any remedy.

However, the sole public policy interest implicated by Glynn's termination is protected by the FCA. Glynn's reliance on 18 U.S.C. § 1513(e) and 10 U.S.C. § 2409 is misplaced because those statutes simply provide the federal government with other tools to protect the same public policy interest: namely, deterring retaliation against whistleblowers. As I have previously stated, "[t]he purpose of the tort of abusive discharge is to vindicate a public policy *in the absence of any civil remedy.*" *Carson v. Giant Food, Inc.,* 187 F.Supp.2d 462, 482–83 (D.Md.2002) (emphasis added).

Here, Glynn has a civil remedy in the form of the FCA retaliation provisions, and Maryland law precludes the use of the wrongful discharge tort to recover in the name of the same public policy interest.[25] *Cf. Porterfield v. Mascari,* 374 Md. 402, 823 A.2d 590, 603 (2003) ("The tort will not lie if the statute provides a civil remedy that would render relief via a wrongful discharge action duplicative."). According-

ly, defendants' motion to dismiss the claim for wrongful discharge in violation of public policy under Maryland law is granted.

## IX.

In his amended complaint, Glynn asserts a claim for injunctive relief based on a new internal employment policy of EDO. (Third Am. Compl. ¶¶ 180–84.) The policy regulates what EDO employees should do in response to government investigations. (*See* Pl.'s Mot. for Leave to File Second Am. Compl. Ex. 3.) Glynn seeks to prevent EDO from enforcing this policy. In their opposition to plaintiff's motion for leave to filed a second amended complaint, defendants sensibly contend that this new claim should be rejected because plaintiff—as a *former* employee—does not have standing to challenge this internal policy. I agree. Glynn makes a curious argument that he has standing because the policy might hinder his efforts in this litigation. (Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. for Leave to File Second Am. Compl. at 2–6.) However, this is not the sort of injury in fact that the standing doctrine contemplates. Any information necessary to this lawsuit can be acquired during the discovery process. Accordingly, I will treat defendants' argument here as part of its motion to dismiss for failure to state a claim upon which relief can be granted and Count IV of the amended complaint shall be dismissed.

## X.

For the reasons discussed above, plaintiff's motions for leave to file second and

---

25. *Wholey,* 803 A.2d at 492, is distinguishable because Maryland does not provide a comprehensive scheme of protection for private employee-whistleblowers, and thus there was no civil remedy whatsoever for the *Wholey* plaintiff. Here, however, Congress created the FCA partially as a remedial scheme for employees of private firms engaging in business with the federal government. Thus, unlike the *Wholey* plaintiff, the legislature has created a civil remedy for Glynn's whistleblowing; the criminal provisions of 18 U.S.C. § 1513(e) and 10 U.S.C. § 2409 are simply other ways in which Congress has sought to enforce the *same* public policy.

third amended complaints are granted. In light of this decision, plaintiff's motion for leave to supplement his opposition to defendants' motion is dismissed as moot. Plaintiff's motion for preliminary discovery on the question of personal jurisdiction and a related motion to stay the pending jurisdictional determination are denied. Defendants' motion to dismiss due to lack of personal jurisdiction is granted as to defendants Caprario and Puzzo but denied as to defendant EDO. Defendants' motion to dismiss the state common law claims because of federal preemption is denied. Defendants' motion to dismiss for failure to state a claim upon which relief can be granted in light of plaintiff's failure to plead acts in furtherance of a *qui tam* suit and causation is denied.

Defendants' motion to dismiss for failure to state a claim upon which relief can be granted in light of the fact that the FCA does not impose liability on parent companies is denied. Defendants' motion to dismiss the New Hampshire state law claim is denied. Defendants' motion to dismiss the Maryland state law claim is granted. Finally, I will treat part of defendants' opposition to plaintiff's motion for leave to file a second amended complaint as a motion to dismiss Count IV of plaintiff's third amended complaint. That motion to dismiss Count IV, which seeks injunctive relief, is granted.